(No. 55659.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROGER COLLINS *et al.*, Appellants.

*Opinion filed February 22, 1985.—Rehearing denied May 31, 1985.*

244

Roger Collins, appellant, *pro se.*

Steven Clark, Deputy Defender, of the Office of the State Appellate Defender, of Chicago, for appellants.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Michael E. Shabat, and James S. Veldman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RYAN delivered the opinion of the court:

The defendants, Roger Collins and William Bracey, were indicted along with Murray Hooper for the armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2), aggravated kidnaping (Ill. Rev. Stat. 1979, ch. 38, par. 10—2(a)(3)), and murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(1)), of Frederick Lacey, R. C. Pettigrew and Richard Holliman. Hooper was tried separately and is not a party to this appeal. Following a jury trial in the circuit court of Cook County, the defendants were found guilty of each offense. A two-stage sentencing hearing was held where the same jury found the existence of statutory aggravating factors and concluded that there were no mitigating factors sufficient to preclude imposition of the death penalty. As a result, the trial court sentenced the defendants to death. The sentence was stayed (87 Ill. 2d R. 609(a)), pending direct appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); 87 Ill. 2d R. 603). The trial court also imposed on each defendant concurrent 60-year prison sentences for the armed-robbery and aggravated-kidnaping convictions.

On November 12, 1980, sometime after 10 p.m., Frederick Lacey, R. C. Pettigrew and Richard Holliman

were taken from apartment 206 at 2240 South State Street in Chicago, placed in a red Oldsmobile, and driven to a viaduct at Roosevelt Road and Clark Street, where they were shot to death. Police officers investigating at the scene found Lacey lying on the ground on the driver's side of the automobile. Pettigrew was lying partially under the right front bumper with pieces of rope and cloth tied around his right wrist. Three expended shotgun shells were found near his body. Holliman was discovered in the back seat, his hands bound with cloth. The record shows that Lacey had been shot in the back of the head. Pettigrew, in addition to being shot in the face, chest and leg, had four shotgun wounds in his back. Holliman had been shot three times in the chest and once in the back of the neck.

The chief prosecution witness was Morris Nellum, who admittedly took part in the crimes. To secure his testimony, the State agreed to recommend a sentence of three years in protective custody in exchange for Nellum's guilty plea to three counts of concealing a homicidal death. The State also agreed to relocate his family.

As to the events which occurred on the night of November 12, 1980, Nellum testified as follows. He was with his girlfriend, Regina Parker, at her apartment at 2222 South State Street. At approximately 9:30 p.m., Collins came to the apartment and asked him to go to apartment 206 at 2240 South State, saying he had something he wanted Nellum to take care of. Nellum went to that location, arriving approximately 10 minutes later. In one of the bedrooms he observed Collins, Bracey, Hooper, and three men he did not recognize. Two of the men, later identified as Pettigrew and Holliman, were on the bed with their hands bound. The third, later identified as Lacey, was standing at the side of the bed. Collins asked Nellum to drive his (Collins') brown Cadillac to Roosevelt Road and Clark Street because "[Collins]

was going to drop some people off, leave them tied up and he wanted me to pick him up." Nellum took Collins' keys and went to the parking lot outside the building where Collins' Cadillac was parked. He observed Collins, wearing a wide-brim hat, Bracey, Hooper, and the three victims emerge from the building and walk to the red Oldsmobile. The three victims were placed in the rear seat; Collins and Hooper got in the front seat, with Collins driving. Bracey meanwhile went to his own automobile, which was parked nearby. After the two vehicles departed, Nellum waited a few minutes, as instructed, and then followed. As he approached the viaduct at Roosevelt Road and Clark Street, he heard a series of shots. Immediately thereafter, he saw Bracey, carrying a sawed-off shotgun, and Hooper run to Bracey's automobile. Collins got in his own car alongside Nellum. As they sped from the scene, Collins said: "That damn Hooper. I told him to wait until—I wanted to use the shotgun because they can't trace the shotgun, but he used the gun instead." According to Nellum, the two vehicles returned to the parking lot at 2240 South State, where Bracey gave him $125 and told him "Just be cool." Nellum then drove with Collins to 31st Street and Lake Michigan, where Collins threw two handguns into the lake. Nellum identified a .38-caliber Charter Arms revolver and a .357 Rugger revolver as the weapons that were thrown in the lake.

On cross-examination Nellum testified that he did not know the reason for the killings but that he went along for "a piece of the action." He also testified that about two months after the murders Hooper told him that $1,800 had been taken from the victims. His credibility was weakened by his admission that he lies when he has to, although he stated that his testimony and statements to the police had been truthful. Yet, he admitted he lied to the police concerning the location of the two hand-

guns. Following his arrest, Nellum denied any knowledge of the whereabouts of the weapons. Three weeks prior to trial, however, he directed the authorities to 31st Street and Lake Michigan, where the guns were recovered by divers. Nellum also testified that he decided to cooperate after prosecutors informed him they would not charge him with murder, but would instead recommend a three-year sentence in exchange for his guilty plea to three counts of concealing a homicidal death.

Under further cross-examination, Nellum denied knowing the victim Lacey and said he could not recall ever having his picture taken with him. The defendants, however, introduced into evidence a series of photographs taken in August of 1980 which showed Nellum and Lacey together with a number of other individuals.

Daretha Redmond testified that she lived in a first-floor apartment at 2240 South State. Sometime after 10 p.m. on the night of the murders, she saw a group of about five men, two of whom appeared to be tied, walk past her living room window. Approximately one month later, she was questioned by the police and shown about 40 photographs. Redmond testified she identified photographs of Collins, Nellum and Hooper as resembling men that were in the group. She further testified that the man leading the group wore a wide-brim hat and that he could have been Collins.

On cross-examination Redmond stated she had never seen Bracey before. She also stated that because she did not see the face of the man who was leading the group, she could not say for certain that she saw Collins on the night of the murders.

Laverne Lyles testified that in November 1980 she lived in a fifth-floor apartment at 2240 South State. On the evening of November 12, she went grocery shopping with two friends, returning to the parking lot of her

building around 10 p.m. Lyles testified she went to her apartment to get a shopping cart for her groceries. As she walked downstairs, she saw Collins on the second-floor landing wearing a "Spanish type" hat and a long, maroon or burnt-orange leather coat. According to Lyles, Collins was on the apartment side of the stairway door and was closing the door as she approached. Lyles stated she went to her automobile and as she was unloading her groceries from the trunk, she observed three men come out of the building and walk toward the parking lot. One of the men, she said, had his hands tied and had a long handkerchief hanging from his mouth. Lyles further testified that she identified a photograph of Bracey as the man in the lead and a photograph of Pettigrew as the man with his hands bound. She could not identify the third man. She also identified a photograph of Collins wearing a wide-brim hat and said it was the same hat he was wearing when she saw him on the second-floor landing.

Christina Nowell told the jury that she first met defendant Bracey in May of 1980 at the King Midas Lounge in Chicago. In late August, Bracey came to her home, and she showed him a .38-caliber Charter Arms revolver which she kept in her bedroom. Nowell stated she went to the basement for a short time, leaving Bracey in the room alone. The following day she discovered that her gun was missing. Nowell further testified that, in early September 1980, she was at the King Midas Lounge with Bracey; that a man and woman came to their table; that the woman gave Bracey a brown paper bag containing a sawed-off shotgun; and that Bracey "broke down" the gun and gave it to William Lane, an employee of the lounge, who put the weapon behind the bar.

On November 25, 1980, she was again at the lounge with Bracey and asked him when he was going to return

her revolver. Nowell testified an argument ensued during which Bracey threatened to have her "wasted." He then told her "he had murdered some people with [her gun] and threw it in the Chicago River."

The evidence also showed that on December 30, 1980, police officers conducting a search of apartment 206 at 2240 South State found two pieces of rope in a bedroom closet. An expert from the Chicago Police Department Crime Laboratory testified that one of the pieces had the same characteristics as the rope found on Pettigrew's wrist and that they "could" have come from the same length of rope. The expert admitted, however, that it was a very common type of rope, found in almost any hardware store.

A firearms expert testified regarding the tests performed on the revolvers recovered from Lake Michigan. The tests revealed that the .38-caliber Charter Arms revolver would mark a bullet with eight lands and grooves to the right while the .357 Rugger revolver would mark a bullet with five lands and grooves to the right. Bullet or bullet fragments bearing the characteristics of at least one of the weapons were found in each victim. However, because of their rusty condition, the expert could not say for certain that the guns fired the bullets taken from the victims. However, the Charter Arms revolver, by use of its serial number, was found to be the gun that had been stolen from Christina Nowell. The expert also testified that the expended shotgun shells found near Pettigrew's body were fired from the same shotgun but that no shotgun was submitted for testing.

Both defendants raised alibi defenses. In addition, they introduced testimony which suggested that Nellum, Hooper and a man named Jesse were responsible for the crimes.

Bracey's alibi consisted of the testimony of his sister, Barbara Harris. When she was asked to recount the

events of November 12, the State objected and argued at a side bar that they had not been informed that Bracey would present an alibi. (Indeed, the record shows that four days earlier Bracey's attorney told the State there would no be alibi defense.) The court then called a recess to give the State an opportunity to question Harris. When she again took the stand she testified that, at approximately 6 p.m. on the day of the murders, Bracey came to her home and had dinner with her and her husband. According to Harris, her husband went to bed between 7 and 7:30, after which she and Bracey discussed a number of financial matters pertaining to his work as an artist. Bracey, she said, left her home about 11:30 p.m. Under cross-examination, Harris admitted she never told the police, State's Attorney, or anyone else in authority that Bracey was with her on the night of the murders.

Bracey, testifying in his own behalf, said he had known Nellum, Hooper and Lacey for a number of years and that he had known a man named Jesse for six or seven years. Saying he was at his sister's house until 11:30 p.m. on November 12, he denied being in apartment 206 on the night of the murders. He also denied ever being in Christina Nowell's home or stealing her revolver. According to Bracey, Hooper had Nowell's revolver. As to the November 25 conversation with Nowell regarding her gun, he testified that because he was a friend of Hooper, Nowell approached him in the King Midas Lounge and asked him to tell Hooper to return it. He testified he told her that the matter was between her and Hooper and that he "didn't have nothing to do with it." He admitted that an argument ensued and that angry words were exchanged, but denied that he threatened to have her "wasted." Supported by the testimony of William Lane, Bracey also repudiated Nowell's assertion that he received a shotgun in the lounge in Septem-

ber of 1980 and gave it to Lane, who put the weapon behind the bar.

In an apparent attempt to reduce the impact on the jury of his criminal record, Bracey admitted on direct examination that he had three prior convictions, one for robbery and two for armed robbery. Cross-examination revealed that the last conviction resulted from an armed robbery which he committed while an escapee from Stateville Penitentiary. Also on cross-examination, Bracey admitted that he never told the police he was at his sister's when the murders were committed, and that he did not tell them that a man named Jesse was involved in the crimes. He also denied telling the police that he was in the area of apartment 206 on the night of the murders. In rebuttal the State called two police officers who testified that, when questioned, Bracey admitted to being in the area of the apartment on the night of the murders. Bracey then again took the stand and explained that he merely replied affirmatively to the officers' question of whether he had "ever" been in the vicinity of the apartment.

Collins, also testifying in his own behalf, said he had 10 previous armed-robbery convictions. He also said he knew Nellum, Hooper, Bracey, and Lacey, having met the latter two while in prison. He further testified that on November 12 his brown Cadillac was parked behind the King Midas Lounge, where it had been for several weeks because of mechanical problems, and that he did not get the car running again until November 15 or 16. As a result, on the night of the murders he was driving his 1968 blue Chevrolet, which he had previously loaned to Sandra Johnson but which was returned to him on November 11.

Collins recounted that at approximately 3 p.m. on the day of the murders he took his girlfriend, Beatrice Mack, to a nearby clinic. They then went to the apartment of

Irene Parker, Mack's mother. Later that evening Collins and Mack went grocery shopping at a nearby A&P, leaving that store between 9:30 and 10 p.m. On the way back to Parker's apartment, they stopped at 2240 South State. While Mack waited in the car, Collins went to apartment 206. According to Collins, only Nellum, Hooper, Derrick Phipps, and Ben Weathers were present. Following a brief conversation, Collins rejoined Mack, and the two returned to Parker's home. There two other individuals who were visiting Parker helped them carry the groceries upstairs, after which they all ate dinner together. Collins testified he left the apartment with Mack at approximately 1 a.m. and that they checked into a motel where they remained until the following morning.

Mack substantially corroborated the events as related by Collins. Her cross-examination revealed, however, that she had been a heroin addict for about five months prior to November 12 and that on the afternoon of the 12th, Collins took her to a clinic where she was undergoing methadone treatment. She also stated that she first dated Collins on November 9, three days before the murders, saying they went to a kung-fu movie at the United Artist Theater in Chicago. In rebuttal the State established that no kung-fu movie was playing at that theater the week of November 9.

Irene Parker, Carolyn Washington and Randolph Harper all testified they had dinner with Collins and Mack on the night of the murders. Washington and Harper also said that at approximately 10:30 p.m. they helped Collins carry groceries from his blue Chevrolet.

In an attempt to establish that his Cadillac was inoperable on the night of the murder and therefore could not have been driven by Nellum, Collins called Sandra Johnson and Earl Young to the stand. Johnson, who had known Collins for almost 10 years, told the jury she was

driving Collins' blue Chevrolet in early November but that she returned the automobile to him on November 11, prior to leaving for a trip to Michigan. She stated she saw Collins' Cadillac on November 10 or 11 parked behind the King Midas Lounge and upon returning from Michigan on November 13, she again observed the Cadillac parked in the same location. Her credibility may have been weakened, however, by her admission that she had been convicted of three counts of robbery and also of misdemeanor theft. In addition, she stated on cross-examination that she was receiving public aid in Illinois, but denied that the purpose of her Michigan trip was to apply for public aid in that State. In rebuttal a Chicago police officer testified to a conversation with Johnson in which she informed him that she went to Michigan to apply for public assistance.

Young, the owner of the King Midas Lounge, testified he first noticed a brown Cadillac parked behind his establishment on November 2. Not knowing the owner, he left a note on the windshield four or five days later requesting that it be removed. Three or four days thereafter he saw a number of men, one of whom he identified as Collins, working on the automobile. According to Young, approximately one and a half to two weeks passed after he first observed the Cadillac until it was removed.

Also testifying for the defendants were Derrick Phipps and Ben Weathers. Both claimed they were in apartment 206 with Nellum and Hooper on the evening of November 12. Bracey, they said, was not present. Around 9:30 p.m., three men, accompanied by a man identified only as Jesse, arrived and went into one of the bedrooms, followed by Nellum and Hooper. Approximately 30 minutes later, Collins arrived looking for Bracey. Upon being informed that Bracey was not present, Collins left the apartment. Shortly thereafter, Phipps

and Weathers departed together, presumably leaving Nellum, Hooper, Jesse and the three men in the bedroom.

The credibility of the witnesses was made vulnerable by the disclosure of their respective criminal records. Weathers admitted he received a 10- to 30-year sentence in 1975 for armed robbery. Phipps pleaded guilty in 1974 to an armed-robbery charge, and in 1976 he received concurrent sentences of 9 to 18 years for attempted murder and 6 to 18 years for armed robbery. (The record also shows—although it was not brought to the attention of the jury—that he was awaiting trial on two additional criminal charges when he testified.) Phipps' credibility may have been further weakened by his inability to give but the vaguest description of Jesse. Although he claimed he first met Jesse in the Stateville Penitentiary, Phipps could only say that he was about the same height and weight as the Assistant State's Attorney conducting the cross-examination. Also, after first being unable to recall what Jesse was wearing when he arrived at apartment 206, he then stated that he was wearing a wide-brim hat similar to the one worn by Collins. Finally, Phipps was unable to describe any of the men who allegedly came to the apartment with Jesse, nor could he recall where the apartment was located in the building.

The defendants first contend that the foregoing evidence was insufficient for the jury to find them guilty of the murders beyond a reasonable doubt. They argue that Nellum's testimony was unworthy of belief, given that he admitted his participation in the crimes and therefore had a motive to lie in order to escape a murder prosecution; that he was shown to have lied about knowing the victim Lacey and about the location of the handguns; that his testimony conflicted with statements of other prosecution witnesses; and that his testimony was directly contradicted by defense witnesses.

A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Vriner* (1978), 74 Ill. 2d 329, 342; *People v. Manion* (1977), 67 Ill. 2d 564, 578; *People v. Bybee* (1956), 9 Ill. 2d 214, 221.) Although the testimony of an accomplice is viewed with suspicion (*People v. Baynes* (1981), 88 Ill. 2d 225, 232; *People v. Todaro* (1958), 14 Ill. 2d 594, 602), we have repeatedly held that it is sufficient to sustain a conviction if it satisfies the jury of the defendant's guilt beyond a reasonable doubt (*People v. Farnsley* (1973), 53 Ill. 2d 537, 544-45; *People v. Coleman* (1971), 49 Ill. 2d 565, 573; *People v. Wollenberg* (1967), 37 Ill. 2d 480, 484-85; *People v. Hansen* (1963), 28 Ill. 2d 322, 332-33). When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant. As the United States Supreme Court observed in *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." The court went on to note that, "[o]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." (Emphasis in original.) 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

In view of these principles, we conclude that there is sufficient evidence to support the jury's verdict. Stated simply, the resolution of the defendants' guilt or innocence depended on the credibility of the witnesses and the weight given their testimony. It is well settled that these determinations are exclusively within the province

of the jury. (*People v. Ellis* (1978), 74 Ill. 2d 489, 496; *People v. Manion* (1977), 67 Ill. 2d 564, 578; *People v. Zuniga* (1973), 53 Ill. 2d 550, 559; *People v. Soukup* (1968), 41 Ill. 2d 94, 97.) Similarly, it is for the jury to resolve any conflicts in the evidence. (*People v. Kubat* (1983), 94 Ill. 2d 437, 468; *People v. Vriner* (1978), 74 Ill. 2d 329, 342.) Here the jury was fully cognizant of the infirmities in Nellum's testimony and was instructed that his testimony was to be viewed with suspicion. Nevertheless, the jury chose to believe Nellum over the defense witnesses, and after reviewing the record, we are not prepared to say that their conclusion was unreasonable.

Defendants next contend that they were not proved guilty of armed robbery beyond a reasonable doubt. As noted earlier, Nellum testified he went along with the others for a "piece of the action" and that upon returning to the parking lot at 2240 South State following the murders, Bracey gave him $125 and told him to "Just be cool." Also, he stated that, approximately two months after the murders, Hooper informed him that $1,800 had been taken from the victims. Defendants argue that Nellum's statement regarding the $1,800 was hearsay, and citing *People v. Clark* (1982), 108 Ill. App. 3d 1071, *People v. Was* (1974), 22 Ill. App. 3d 859, and *People v. Hines* (1973), 12 Ill. App. 3d 582, they assert that an essential element of a crime cannot be proved solely through hearsay evidence. Defendants' reliance on *Clark* and *Was* is misplaced. In those cases the hearsay evidence was properly excluded on appeal since appropriate objections had been raised at trial. As a result, there was insufficient evidence remaining to sustain the convictions. In *Hines*, however, the court stated that hearsay evidence alone cannot establish an essential element of the State's case, even if it is received without objection. Thus, despite a stipulation to the hearsay evidence by the parties, the court held that its admission consti-

tuted reversible error, reasoning that it violated the defendant's sixth amendment right of confrontation. (12 Ill. App. 3d 582, 587.) In this respect the court's conclusion conflicts with this court's holding in *People v. Trefonas* (1956), 9 Ill. 2d 92. In *Trefonas*, the defendant contended in part that the admission of hearsay evidence deprived him of his right of confrontation under the Illinois Constitution. After observing that the defendant failed to object to the evidence at trial, this court held:

"Failure to make proper and timely objection to the admission of evidence claimed to be incompetent or otherwise objectionable or to move to strike it out after its admission, giving specific reason for the objection or motion to strike out such evidence generally constitutes a waiver of the right to object and cures the error, if any. ***

While the accused has the right to insist that only competent evidence shall be introduced against him, yet he may waive such right and does so by failure to interpose in apt time proper objections. [Citations.] Objections to evidence may be waived *even though based on constitutional grounds* for the defendant may by a plea of guilty or a confession waive the production of all evidence of his guilt." (Emphasis added.) (9 Ill. 2d 92, 98-99.)

Other decisions have firmly established that hearsay evidence, if admitted without objection, "is to be considered and given its natural probative effect." *People v. Akis* (1976), 63 Ill. 2d 296, 299; *Town of Cicero v. Industrial Com.* (1950), 404 Ill. 487, 495; see generally Annot., 79 A.L.R.2d 890 (1961).

In the present case not only was there no objection, the hearsay was elicited by the defendants during Nellum's cross-examination. (See *People v. Farnsley* (1973), 53 Ill. 2d 537, 545-46 (in murder prosecution defendant assisted in establishing fundamental element of State's case).) Under the circumstances, Nellum's hearsay testimony was properly considered by the jury and taken together with his other statements was sufficient to estab-

lish that the defendants had committed armed robbery.

Defendant Collins also claims that the trial court erred by failing to suppress photographs allegedly seized during an unconstitutional search. One of the photographs, showing Collins wearing a wide-brim hat in apartment 206 on another occasion, was introduced into evidence at trial.

At the hearing on the motion to suppress, defendant Collins testified that he was arrested at his second-story apartment at 534 West Marquette on February 5, 1981. He stated that at the time of his arrest the police searched his apartment without a warrant and found the pictures inside a satchel in one of the closets.

Sergeant Michael Hoke of the Chicago police department, one of the arresting officers, testified for the State. Sergeant Hoke stated that the pictures were not seized at the time of Collins' arrest, but rather were found in a garbage bag during a later visit to the apartment building. Sergeant Hoke stated that on February 22, 1981, he and his partner returned to the apartment building to interview the people who lived across the hall from Collins. Hoke testified that they first knocked on the front door of the second-floor apartment but received no answer. They then went out and around to the back of the building and went up an outside stairway to the "second floor landing" or porch. They then knocked on both doors but again received no answer. Sergeant Hoke testified that while on the second-floor landing he noticed a garbage bag sitting next to defendant Collins' back door. The pictures were found inside the garbage bag.

The janitor of Collins' apartment building testified in rebuttal. He stated that two large containers were provided on the ground near the building for depositing garbage. He stated that tenants were told not to place garbage bags on the back porches but admitted that some

did. He also stated that the building had 18 apartments and nine rear porches with two doors per floor opening onto each porch.

The trial judge found Sergeant Hoke's testimony to be more credible and accepted his version of the finding of the pictures. He also found the search of the garbage bag to be constitutionally permissible and denied the motion to suppress.

Defendant Collins argues that even accepting Sergeant Hoke's version, the pictures should have been suppressed because the search of the garbage bag violated the fourth amendment. We disagree.

The fourth amendment protects people, not places or things. (*Katz v. United States* (1967), 389 U.S. 347, 351, 19 L. Ed. 2d 576, 582, 88 S. Ct. 507, 511.) In order to invoke the protection of the fourth amendment, a person must have had a reasonable expectation of privacy in the place searched. (*Rakas v. Illinois* (1978), 439 U.S. 128, 143, 58 L. Ed. 2d 387, 401, 99 S. Ct. 421, 430; *People v. Holt* (1982), 91 Ill. 2d 480, 493; *People v. Stein* (1977), 51 Ill. App. 3d 421, 432.) Thus the proper test is not whether the garbage bag was abandoned in the property law sense, but whether there was an abandonment of the defendant's reasonable expectation of privacy as to the garbage bag. 1 LaFave, Search and Seizure, sec. 2.6(c) (1978); see Annot., 28 A.L.R.4th 1219 (1984).

In the present case the garbage bag was placed on the second-floor landing of an outdoor stairway which served a multi-unit apartment building. We do not believe that the defendant could have placed the garbage bag in such an openly accessible common area of the apartment building and still have retained a reasonable expectation of privacy as to its contents. The search was no more intrusive than what the defendant might have expected from passing tenants, vagrants, neighborhood children, or animals. (*People v. Holt* (1982), 91 Ill. 2d

480, 493.) Since the defendant did not have a reasonable expectation of privacy as to the place searched, the search did not violate the fourth amendment and the trial court was correct in denying the motion to suppress. *Rakas v. Illinois* (1978), 439 U.S. 128, 143, 58 L. Ed. 2d 387, 401, 99 S. Ct. 421, 430; *People v. Holt* (1982), 91 Ill. 2d 480, 483.

Defendants further allege that they were denied a fair trial because the jury was allowed to hear evidence and argument that certain prosecution witnesses had been relocated or were in protective custody. Defendants argue that the testimony was irrelevant and highly prejudicial because it gave the jury the impression that the defendants were dangerous men and a threat to the safety of the witnesses.

The first incident complained of occurred during the State's direct examination of Laverne Lyles. She had stated that she lived at 2240 South State in November of 1980 and was then questioned as follows:

"Q. You no longer live at that location, do you, ma'am?
A. No.
Q. You have been relocated to another area?
A. Yes."

The defense then objected and moved for a mistrial, claiming that the word "relocated" gave the jury the impression that the witness had been relocated by the State to protect her from the defendants. The trial judge denied the motion for a mistrial, explaining that the word "relocated," standing alone without further elaboration, meant nothing to the jury.

Defendants argue that the use of the word "relocated" so prejudiced them as to deny them a fair trial, citing *People v. Herbert* (1935), 361 Ill. 64. In *Herbert*, this court held that a prosecution witness' statement that "she had had police officers detailed at her home

for some time just prior to trial" was so prejudical as to deny the defendant a fair trial. (*People v. Herbert* (1935), 361 Ill. 64, 69-70.) The *Herbert* case is distinguishable from the present case. In *Herbert,* the clear inference to be drawn from the witness' statement was that her safety was threatened by her testifying at trial, thus requiring a police guard at her home. In the present case the mere mentioning of the word "relocated" does not give rise to an inference that Lyles relocated because of a fear of the defendants or that her relocation was arranged by the State. (See *People v. Stephens* (1974), 18 Ill. App. 3d 971, 975.) The mere mention of the word "relocated" did not so prejudice the defendants as to deny them a fair trial.

Defendants argue that later testimony and comments in closing argument concerning the relocation of Lyles did deny them a fair trial. Again, we disagree. During cross-examination of Lyles the defense brought out the fact that Lyles had received money from the State's Attorney's office. On redirect examination by the State, Lyles testified that the money had been for security deposits and rent. There is nothing unfair about allowing the State to explain on redirect examination why it gave one of its witnesses money when that fact had been brought out by the defense during cross-examination. In closing argument, the defense referred to Lyles as being "well taken care of." On rebuttal the State asked, "Why do you think we moved her? Do you think we were concerned about her [*sic*] responsibility to Laverne Lyles?" Again, there is nothing unfair about allowing the State to explain in rebuttal argument why a defense witness was being "taken care of" by the State when that issue was raised by the defendant during closing argument. The complained-of testimony and arguments were invited by the defendants and thus did not deprive them of a fair trial. *People v. Zuniga* (1973), 53 Ill. 2d 550, 557-

58; *People v. Hampton* (1962), 24 Ill. 2d 558, 561-62.

Defendants also allege that they were denied a fair trial because testimony was introduced concerning the fact that Morris Nellum was being held in protective custody. Nellum testified during direct examination by the State that in return for his truthful testimony and plea of guilty on the concealment charges the State had agreed to recommend "three years protective custody and relocate my family." The defendants did not object to the testimony. An agreement reached between an accomplice witness and the State to secure the witness' testimony is relevant because it goes to the credibility of the witness and the weight to be given his testimony. (*People v. Wollenberg* (1967), 37 Ill. 2d 480, 484-85; *People v. Hansen* (1963), 28 Ill. 2d 322, 332.) Nellum's testimony concerning his agreement with the State was relevant and did not deprive the defendants of a fair trial.

Defendants also allege that the testimony of Officer Bedoe, who accompanied Nellum to the lake when the guns were recovered, improperly reemphasized that Nellum was being held in protective custody. When testifying as to the preliminary steps in receiving Nellum from the jail, Officer Bedoe stated that he went to the "floor that contains the witness protection unit" and got Nellum. Officer Bedoe's statement was incidental and concerned a fact which the jury had already become aware of through Nellum's unobjected-to testimony. The statement did not so prejudice the defendants as to deny them a fair trial. See *People v. Manzella* (1973), 56 Ill. 2d 187, 200; *People v. Cavanaugh* (1958), 13 Ill. 2d 491, 492.

The defendants also allege that the trial court erred by allowing the State to impeach Beatrice Mack and Sandra Johnson on collateral matters. Miss Mack testified that she was with defendant Collins on November 12, 1980 (the day of the murders), from 3 p.m. until the

next morning. She was able to recall where they went, the specific times they arrived and left the different locations, whom they saw and what they had for supper. She testified on cross-examination that she knew specifically that her first date with Collins was on November 9, 1980. She recalled that on that date she and Collins attended a kung-fu movie at the United Artists Theater. She also remembered that on the way to the movies she met Carolyn Washington and introduced Collins to her for the first time. On rebuttal the State called the manager of the United Artists Theater, who stated that there was not a kung-fu movie showing on November 9. Defendant Collins alleges that it was error for the court to allow the State to impeach Miss Mack's testimony concerning their activities on November 9.

The latitude to be allowed on cross-examination and rebuttal is a matter within the sound discretion of the trial court, and a reviewing court should not interfere unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant. (*People v. Peter* (1973), 55 Ill. 2d 443, 451-52; *People v. Columbo* (1983), 118 Ill. App. 3d 882, 966.) Generally, any permissible kind of impeaching matter may be developed on cross-examination, since one of the purposes of cross-examination is to test the credibility of the witnesses. (*People v. Columbo* (1983), 118 Ill. App. 3d 882, 966; *People v. Mannen* (1977), 46 Ill. App. 3d 61, 64.) However, the cross-examiner may not impeach a witness on a collateral matter; he must accept the witness' answer. (*People v. Columbo* (1983), 118 Ill. App. 3d 882, 966; McCormick, *Evidence* sec. 47, at 98 (2d ed. (1972).) The test to be applied in determining if a matter is collateral is whether the matter could be introduced for any purpose other than to contradict. (*People v. Moore* (1981), 105 Ill. App. 3d 264, 272; *People v. Byer* (1979), 75 Ill. App. 3d 658, 669.) The application of the "collateral" test, like the lat-

itude allowed in cross-examination and rebuttal, is best left "largely in the control of the trial court." (3A Wigmore, *Evidence* sec. 1003, at 964 (Chadbourn rev. 1970).) In the present case defendant Collins was first arrested for the murders a month and a half after they occurred. Miss Mack's testimony was 8½ months after the murders occurred. The trial court ruled that Miss Mack's testimony as to what she and defendant Collins did on their first date, three days prior to the date of the murders, was not collateral because it went to her ability to recall their activities during that second week of November when the murders occurred. We do not find the trial court ruling to be an abuse of discretion.

Defendants also allege that the trial court erred by allowing the State to cross-examine Mack as to her addiction to heroin. Miss Mack testified that on the date of the murders she was a "heroin detoxicate" and was on a methadone (heroin substitute) program. Miss Mack stated that prior to November 12 she had been a heroin addict for about five months. She was then questioned about her habit and the extent of her addiction. The question of whether a witness is a narcotics addict at the time of testifying or at the time that an event occurred is a proper subject of cross-examination because it goes to the credibility of the witness and the witness' ability to recall. (*People v. Galloway* (1974), 59 Ill. 2d 158, 163; *People v. Strother* (1972), 53 Ill. 2d 95, 99.) The fact that Mack was on a methadone program on the date of the murders does not make the questioning improper. Again, the latitude to be allowed during cross-examination is a question for the trial judge. *People v. Peter* (1973), 55 Ill. 2d 443, 451-52.

Defendants also argue that it was improper for the State's Attorney to question Mack about her style of wearing jewelry. During cross-examination the State asked Miss Mack:

"Q. By the way, Miss Witness, I saw you in the hall and you had an earring in your nose isn't that correct?"

An objection to the question was sustained, and the question was stricken. We agree that the question was improper and showed a total lack of professionalism on the part of the assistant State's Attorney; however, we do not believe that it so prejudicial as to deny the defendants a fair trial. *People v. Manzella* (1973), 56 Ill. 2d 187, 200; *People v. Cavanaugh* (1958), 13 Ill. 2d 491, 492.

Defendants also argue that the State was allowed to impeach Sandra Johnson on a collateral matter. No objection was raised concerning the impeachment and thus the issue is waived. *People v. Caballero* (1984), 102 Ill. 2d 23; *People v. Nilsson* (1970), 44 Ill. 2d 244.

Defendants next argue they were denied a fair trial because one of the jurors was the wife of a judge who previously sentenced Bracey to prison. During *voir dire* it was learned that Dorothy Downing was the wife of Justice Robert Downing of the Illinois Appellate Court and that Justice Downing had previously served as a criminal court judge in the circuit court of Cook County. Mrs. Downing stated, however, that although her husband was a judge, it would not cause her to favor one side or the other, and she assured the court that she could be impartial. The record reveals that defense counsel possessed Bracey's conviction record which showed that in 1970 Judge Downing sentenced Bracey to 12 to 36 years in prison for armed robbery. Despite this fact, no objection was raised to Mrs. Downing being sworn as a member of the jury, nor was any allegation of prejudice asserted in defendants' written motion for a new trial. The failure to challenge a juror for cause or by peremptory challenge waives any objection to that juror. (*People v. Ford* (1960), 19 Ill. 2d 466, 475; *People v. Hotchkiss* (1931), 347 Ill. 217, 219-20.) Here the jury was

duly accepted by the defendants; they cannot now be heard to complain that they were denied a fair trial.

Defendants complain that they were denied effective assistance of counsel because their attorneys did not impeach Nellum with his grand jury testimony. Nellum's testimony before the grand jury—as is often the case—consisted entirely of affirmative responses to leading questions. He was not asked about his knowledge concerning the location of the handguns used in the murders, nor did he volunteer any information on the subject. Defendants contend that his knowledge of the disposal of the weapons was a matter which one would have reasonably expected him to disclose to the grand jury, and his failure to do so provided a basis for impeachment by omission which their attorneys failed to utilize. Assuming for the sake of argument that Nellum should have disclosed his participation, it cannot be said that the failure to impeach him by omission constituted inadequate representation.

At trial Nellum admitted under cross-examination that, despite taking part in disposing of the handguns in Lake Michigan, he denied any knowledge of their whereabouts when originally questioned by the police. Having thus established that Nellum had, in fact, lied, nothing further could have been accomplished by counsel then showing that he omitted to tell the grand jury of his involvement in disposing of the weapons.

Defendants further assert it was incompetence of counsel to reveal to the jury that Judge Downing previously sentenced Bracey to a 12- to 36-year term in the penitentiary. Bracey's attorney—undoubtedly anticipating impeachment by the State—sought to blunt the effect of Bracey's criminal record by exposing it on direct examination. In doing so, he referred not only to each conviction but also to the name of each sentencing judge. Defendants contend it was unnecessary and exhibited

"gross incompetence" to mention Judge Downing's name when Mrs. Downing was a member of the jury.

The Supreme Court, in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, recently announced the standards to be applied in cases involving specific allegations of ineffective assistance of counsel. Recognizing that it is all too easy to second-guess an attorney's performance, the court stated that "a court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that the inquiry is "whether counsel's assistance was reasonable considering all the circumstances." (466 U.S. 668, 688-89, 80 L. Ed. 2d 674, 694, 104 S. Ct. 2052, 2065-66.) In order to establish ineffective assistance, a defendant must show (1) that counsel committed errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) that those errors, in fact, were prejudicial to his defense. 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.

In this case both defense attorneys made a strategic decision to permit Mrs. Downing to become a member of the jury, even though they knew Judge Downing sentenced Bracey to the penitentiary in 1970. Inasmuch as they were in a position to view her demeanor in responding to questions propounded by the court, we cannot say from merely reading a cold record that their decision was unreasonable. We do feel, however, that Bracey's attorney made an error in judgment when he later mentioned Judge Downing's name in connection with one of Bracey's prior convictions. Yet we do not believe that the single error was of such magnitude "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) On the contrary, the record indicates that both attorneys

were experienced criminal lawyers. They conducted vigorous cross-examination, raised countless objections, adequately presented the alibi defenses, and in all respects sought to protect the interests of their clients. Viewed in this light, it cannot reasonably be said their "conduct so undermined the proper functioning of the adversarial process" as to bring into question the integrity of the verdict, which, the Supreme Court said, is the benchmark for judging ineffectiveness claims. 466 U.S. 668, 686, 80 L. Ed. 2d 674, 692-93, 104 S. Ct. 2052, 2064.

Moreover, it is worth mentioning that defendants have made no attempt, as required under *Strickland*, to affirmatively prove that the error was prejudicial to their defense. (466 U.S. 668, 693, 80 L. Ed. 2d 674, 697, 104 S. Ct. 2052, 2067.) "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test ***." (466 U.S. 668, 693, 80 L. Ed. 2d 674, 697, 104 S. Ct. 2052, 2067.) Rather, a defendant is required to show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." (466 U.S. 668, 695, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2069.) Defendants do not allege that absent the reference to Judge Downing they probably would not have been convicted, and there is nothing in the record which even remotely suggests that the outcome would have been different. Defendants apparently would like us to presume that Mrs. Downing became so biased that it destroyed her impartiality. We decline to do so. As this court said in *People v. Cole* (1973), 54 Ill. 2d 401, 415, mere suspicion of bias is not sufficient to disqualify a juror. Also, *Strickland* stated that the assessment of prejudice should proceed on the assumption that the decision maker is reasonably, conscientiously, and impartially applying the standards that govern the decision. (466 U.S.

668, 695, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.) We conclude, therefore, that defendants have failed to establish ineffective assistance of counsel.

The defendants contend that several instances of prosecutorial misconduct during closing argument denied them due process of law. Most of the comments about which they now complain were not objected to and will not therefore be considered by this court on appeal. *People v. Pastorino* (1982), 91 Ill. 2d 178, 193; *People v. Carlson* (1980), 79 Ill. 2d 564, 577.

The defendants had attempted to convince the jury that they were not involved in the murders, but that Murray Hooper, Morris Nellum and a mysterious third person known only as Jesse were the actual killers. During closing argument, the prosecutor stated that the man named Jesse had not been mentioned by the defendants during cross-examination of the prosecution's witness Nellum. The defendants objected and pointed out that that statement was an error because Jesse had been mentioned. The defendants now contend that this erroneous statement misled the jury. We do not agree. The prosecutor had prefaced his remarks with a statement that nothing he said was to be considered as evidence. When the defendant objected to the prosecutor's statement concerning Jesse, the court overruled the objection and told the jury that they were to rely upon their recollection of what the evidence had been. We see no error in this ruling, nor do we see any prejudice resulting from the remarks and the manner in which the objection was handled by the judge.

Nellum admitted on cross-examination that he had lied to the police when he told them he did not know where the guns were. During closing argument the prosecutor referred to this witness making this admission. He then stated:

"And you also heard that I interviewed Nellum a few hours later. Did you hear any questions about what Nellum told me about the guns? Did you hear anything about that at all? Did any lawyer for the defense ask that question?"

The court overruled an objection to these statements. The defendants now contend that this was error.

This statement, as are many statements often made during the course of a trial, is one that would have been better left unsaid. However, we cannot say that it constituted reversible error. Defendants argued that this was an attempt to tell the jury that Nellum had, before trial, made a statement consistent with his testimony at trial. This is one inference that could possibly be drawn from this statement. However, there was but a fleeting reference to this subject, and the prosecutor did not dwell on it further. Nellum had admitted he had lied to the police on the subject of the guns. He admitted that he was an accomplice in the case and that he had received favorable treatment in exchange for his testimony. The jury had to evaluate his testimony in light of these facts. It is doubtful if the objected-to statement did anything to rehabilitate Nellum in the eyes of the jury. Even comments that may be said to be improper do not constitute reversible error unless they result in substantial prejudice. *People v. Tiller* (1982), 94 Ill. 2d 303, 321; *People v. Baptist* (1979), 76 Ill. 2d 19, 29.

Defense counsel, in arguing to the jury, dwelt on the credibility of the witnesses and stated:

"But they want Collins so bad, so bad that they made a guy come in here and tell you something that he knows is not in that report."

In rebuttal to this, the prosecutor stated:

"And if you think I would jeopardize my license, my family, my children, my future, to put Mr. Dorfman on in a case and make him lie ***."

Defendants argue that this reference by the prosecutor to his personal integrity was error. We do not agree. The prosecutor's integrity had been challenged by the defense's assertion that he had put a witness on the stand and made him lie. This response by the prosecutor was invited and cannot be relied on as error. *People v. Vriner* (1978), 74 Ill. 2d 329, 344.

The defendants contend that the prosecutor diminished the State's burden of proof by his comment concerning the State's burden to prove the defendants guilty beyond a reasonable doubt. The prosecutor stated in final argument:

> "That is the same burden of proof in every case that is tried in this courtroom, every case that is tried in this county, and every case that is tried in this country. It is beyond a reasonable doubt. The penitentiary is full of people like Collins and Bracey who have been proved guilty beyond a reasonable doubt."

In *People v. Bryant* (1983), 94 Ill. 2d 514, 523, this court held that similar remarks made by the prosecutor in closing argument did not reduce the State's burden of proof.

The last argument concerning the prosecutor's misconduct concerns an alleged misstatement by the prosecutor concerning Lyles' testimony about seeing Collins on the second floor of the apartment building on the night of the murders. The prosecutor related Lyles' testimony as saying that Collins "stopped and stepped back in and closed the door." When defense counsel objected and said, "that is not the testimony," the court stated, "the jury will rely on their recollection."

Defendants now argue that the prosecutor misstated Lyles' testimony and was telling the jury that Collins was attempting to avoid being seen by her. The prosecutor could argue any logical inference that could be drawn from the evidence. (*People v. Higgins* (1972), 50 Ill. 2d

221, 228.) The jurors heard the evidence and could evaluate the inference the prosecutor had drawn from the evidence in light of their own recollection, as the court, in response to defendants' objections, stated they should do. We see no error in the statement the prosecutor made. None of the alleged acts of misconduct by the prosecutor during closing argument constitute reversible error.

Defendants next allege that they were denied a fair trial because the qualification of prospective jurors pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 St. Ct. 1770, resulted in a conviction-prone jury. This court has consistently rejected this argument. (*People v. Caballero* (1984), 102 Ill. 2d 23, 44-45; *People v. Free* (1983), 94 Ill. 2d 378; *People v. Lewis* (1981), 88 Ill. 2d 129, 147.) Defendants cite Winick, *Prosecutorial Peremptory Challenge Practices in Capital Cases: An Empirical Study and a Constitutional Analysis*, 81 Mich. L. Rev. 1 (1982), and the studies examined in *Grigsby v. Mabry* (E.D. Ark. 1983), 569 F. Supp. 1273, as persuasive authority. The United States Court of Appeals for the Eighth Circuit recently affirmed the district court's decision in *Grigsby* and held that a death-qualified jury was conviction prone and did deny the defendant his constitutional right to a fair trial. (*Grigsby v. Mabry* (8th Cir. Jan. 30, 1985), 53 U.S.L.W. 2395.) The *Grigsby* decision, however, contradicts the holding in *Keeten v. Garrison,* wherein the United States Court of Appeals for the Fourth Circuit held that the qualification of jurors pursuant to *Witherspoon* does not result in a conviction-prone jury so as to deny a defendant his constitutional rights. *Keeten v. Garrison* (4th Cir. 1984), 742 F.2d 129, 134.

Furthermore, the United States Supreme Court recently clarified its decision in *Witherspoon* regarding when jurors could be excused because of an unwilling-

ness to consider the death penalty. The court rejected the often-quoted standard, drawn from *Witherspoon* footnote 21, which implied that jurors could be excused for cause only when it was unmistakably clear that they would *automatically* vote against the imposition of the death penalty regardless of the evidence (see *Witherspoon v. Illinois* (1968), 391 U.S. 510, 522, n.21, 20 L. Ed. 2d 776, 785 n.21, 88 S. Ct. 1770, 1777 n.21), and held that the proper "standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985), 469 U.S. ___, ___, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852.) In deciding *Wainwright,* the court was aware of the *Grigsby* lower court decision and the *Keeten* decision and the studies allegedly showing that death-qualified juries are conviction prone. (*Wainwright v. Witt* (1985), 469 U.S. ___, ___ n.11, 83 L. Ed. 2d 841, 874 n.11, 105 S. Ct. 844, 871 n.11 (Brennan, J., joined by Marshall, J., dissenting).) We do not believe that the Supreme Court would be clarifying the standard for determining when a juror may be excused for cause and choosing a lesser standard than some lower courts have been applying if the actual exclusion of the juror would result in the defendant being denied his constitutional rights. In light of the Supreme Court's decision in *Wainwright v. Witt,* we adhere to our position and reject the argument that the qualification of jurors pursuant to *Witherspoon* results in a conviction-prone jury so as to deny a defendant his constitutional rights.

Defendants also allege that their death sentences should be overturned because a juror was excused in violation of *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. The juror in question was equivocal as to whether he would ever impose the death penalty. After lengthy questioning he finally responded:

"Q. Then you are saying you could not consider it [death penalty]?

A. That's probably true."

The trial judge then excused the juror for cause. We have recognized that the trial judge is in a superior position to ascertain the meaning which one being questioned intends to convey. (*People v. Free* (1983), 94 Ill. 2d 378, 403; *People v. Gaines* (1981), 88 Ill. 2d 342, 357.) Also, defendants' trial attorneys must have felt that the juror was properly excused because no objection was raised. From a review of the questioning, we are satisfied that the juror was excused in compliance with the standards set out in *Witherspoon*, particularly in light of the Supreme Court's holding in *Wainwright v. Witt* (1985), 469 U.S. ___, ___, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852.

Defendants allege that they should be granted a new death sentencing hearing because the trial judge erred in denying them a continuance after the guilt phase of the trial. The jury convicted the defendants on the evening of July 29, 1981. At that time the defendants requested that the death sentencing hearing not commence for at least a day. The trial judge, however, began the first phase of the death sentencing hearing the next afternoon. At that time, the defendants moved for a continuance and requested one to two weeks to prepare. The motion was denied, and the defendants were found eligible for the death penalty. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b).) The second phase of the death sentencing hearing began the next morning, July 31, 1981.

Defendant Bracey argues that his motion for a continuance should have been granted to allow his trial counsel time to investigate double-murder and attempted-murder charges pending against Bracey in Arizona. The State intended to use the Arizona crimes against Bracey in the second phase of the death sentence

hearing and had listed some of the Phoenix witnesses on its answer to discovery filed June 5, 1981. Bracey's counsel was also furnished police reports concerning the Phoenix crimes on the first day of the trial. At the second stage of the sentencing hearing the surviving victim of the Phoenix crimes, Marilyn Redmond, testified as to the attack on her family and identified Bracey as one of the murderers. Two of the investigating officers from Phoenix also testified. It is important to note that Bracey was subsequently convicted of the Arizona crimes. This court will not set aside a sentence unless the defendant can show some actual prejudice from the error complained of. (*People v. Silagy* (1984), 101 Ill. 2d 147, 182.) Since the purpose of the continuance would have been to allow Bracey's counsel to gather evidence to show that Bracey had not committed the Arizona crimes, we fail to see how he is now prejudiced. If we were to find the denial of the continuance to have been improper and remand for a new sentencing hearing, the State would then introduce Bracey's Arizona convictions into evidence, thus raising an even stronger inference that Bracey committed the Arizona crimes. We do not feel that the denial of the continuance was in error.

Along with Bracey's attorney needing more time to investigate the Arizona crimes, both defendants argue that their attorneys needed more time to investigate defendants' prior crimes and develop evidence in mitigation. The granting or denial of a continuance is a matter resting in the sound discretion of the trial judge, and a reviewing court will not interfere with his decision unless there has been a clear abuse of discretion. (*People v. Latimer* (1966), 35 Ill. 2d 178, 181.) In the present case the defense was made aware of the fact that the death penalty might be sought because the indictment charged the defendants with a multiple murder. (*People v. Caballero* (1984), 102 Ill. 2d 23, 49; *People v. Gaines* (1981),

88 Ill. 2d 342, 369.) The defense also knew that they would be able to offer evidence in mitigation at the second phase of the sentencing hearing and that the State would be able to introduce evidence of the defendants' prior crimes. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c).) From a review of the record, we find that the prior crime victim and investigating officers were cross-examined competently and adequately. On appeal the defendants conjecture as to what the trial attorney might have done had they been granted the continuance. However, the defendants do not point to any matters that were not available at the time of the hearing that would have become available had the continuance been granted. The fact that there were other strategies available to the trial attorneys which were not pursued does not mean that the attorneys were unprepared. We do not feel that the trial judge abused his discretion by denying the continuance.

Defendant Bracey also alleges that it was error for the trial court to allow the State to introduce evidence of the pending Arizona charges. He argues that the introduction of evidence concerning a convictionless crime during the second phase of the death sentencing hearing is improper. We have held in the past that the jury at the second stage of the death sentencing hearing may consider any evidence which is shown by reliable testimony and is relevant in aggravation or mitigation. (*People v. Silagy* (1984), 101 Ill. 2d 147, 174; *People v. Free* (1983), 94 Ill. 2d 378, 422.) This includes convictionless crimes with which the defendant is charged. (See *People v. Ruiz* (1982), 94 Ill. 2d 245, 267-68; *People v. La Pointe* (1981), 88 Ill. 2d 482, 498-99.) Defendant argues, however, that the jury could not be expected to be unbiased in evaluating the evidence of the Arizona crimes after finding him guilty on the triple murders in Illinois. The fact the sentencing jury convicted the defendant does not make

them biased against him during the sentencing phase. *People v. Lewis* (1981), 88 Ill. 2d 129, 146; *People v. Free* (1983), 94 Ill. 2d 378, 402.

Defendants contend they should be granted a new sentencing hearing because of prosecutorial remarks during the sentencing phase of the trial. They assert it was inflammatory for the prosecution to argue that a failure to vote for the death penalty would be a slap in every war veteran's face. Following the prosecution's closing arguments, defense counsel made an emotional plea for the lives of the defendants. The unmistakable import of his argument was that even if the jury found there were no mitigating factors sufficient to preclude imposition of the death penalty, it must nevertheless refuse to sentence the defendants to death because there is *never* any justification for taking the life of another. In rebuttal, the prosecution, after reminding the jurors of their oaths, made the following remarks:

"[THE PROSECUTOR]: I'm not going to get up here and give you a sermon. I'm not going to preach. But I am going to comment on one thing that [defense counsel] said. He said, 'Thou shalt not kill.'

I've heard that before. People in 1941 through 1945 killed in the name of their country—

[DEFENSE COUNSEL]: Judge, I'm objecting to this argument.

THE COURT: Overruled.

[THE PROSECUTOR]:—in service to their country. Some of us went to Viet Nam and had to kill for this country, and I will be damned if anybody is going to tell me that what we did in Viet Nam or in any other war was a violation of the Fifth Commandment of the Bible.

[DEFENSE COUNSEL]: Objection. This is entirely wrong—

THE COURT: Overruled.

[THE PROSECUTOR]: It is no more killing than what you ladies and gentlemen of the jury swore that you would do after we presented all of the evidence in this

case.

> To stand up here and tell you that if you in fact find that there are no mitigating factors, no mitigating circumstances sufficient enough to preclude the imposition of the death penalty, is a slap in every veteran's face.
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Overruled. He may argue, just as you argued."

We do not agree with defendants' interpretation of the above-quoted language. The prosecution was not arguing that a rejection of the death penalty would be "a slap in every veteran's face." Viewed in the context in which they arose, the prosecution's remarks were a legitimate response to defense counsel's emotional closing argument. Using war as an example of when a person has the right to take the life of another, the prosecution merely told the jury that they had the same right under the law and that to say, as defense counsel had argued, that killing is never justified would impugn the integrity of every war veteran who killed in the service of his country. Although the State concedes in its brief that the remarks were a "bit dramatic," there is no question that they were invited. Defendants, therefore, cannot be heard to complain that they were improper. *People v. Vriner* (1978), 74 Ill. 2d 329, 344.

Defendants point to two additional prosecution statements which they allege were inappropriate. However, since no objection was interposed we will not consider them on appeal. *People v. Pastorino* (1982), 91 Ill. 2d 178, 193; *People v. Carlson* (1980), 79 Ill. 2d 564, 577.

Defendants also argue that because they were not proved guilty of armed robbery beyond a reasonable doubt, the sentencing jury improperly considered those convictions during its deliberations. Defendants therefore claim they are entitled to a new sentencing hearing. As we have already concluded that there was sufficient

evidence to find defendants guilty of armed robbery, there is no merit to their argument.

Defendants next raise several challenges to the constitutionality of the Illinois death penalty statute. Defendants contend that the sentencing jury's consideration of nonstatutory aggravating factors results in an arbitrary imposition of the death penalty. They also claim that there is no provision for meaningful review which can insure that the death penalty is not imposed capriciously. Both these arguments were rejected by this court in *People v. Stewart* (1984), 105 Ill. 2d 22, 76-78, *People v. Owens* (1984), 102 Ill. 2d 145, 159-60, *People v. Silagy* (1984), 101 Ill. 2d 147, 161, and *People v. Williams* (1983), 97 Ill. 2d 252, 265-66. Defendants contend our statute is unconstitutional because it fails to require the prosecution to prove beyond a reasonable doubt that there were no mitigating factors sufficient to preclude imposition of the death penalty. We rejected this claim in *People v. Silagy* (1984), 101 Ill. 2d 147, 161, *People v. Garcia* (1983), 97 Ill. 2d 58, 80-81, and *People v. Free* (1983), 94 Ill. 2d 378, 421. We see no reason to depart from our holdings in those cases. Lastly, defendants claim that the standardless discretion vested in the prosecutor to determine to seek the death sentence results in the arbitrary imposition of the death penalty. Recognizing that we rejected the same argument in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, defendants nevertheless ask us to reconsider our decision in that case. We decline to do so.

Finally, the trial judge imposed extended terms of 60 years in prison on the armed-robbery and aggravated-kidnaping charges for each defendant. The 60-year sentence on the armed-robbery charge was proper, as it was a Class X felony. (Ill. Rev. Stat. 1979, ch. 38, pars. 18—2(b); 1005—8—2(a)(2).) The 60-year sentence on the aggravated-kidnaping charge was improper, however, be-

cause the kidnaping was not for ransom and thus was only a Class 1 felony carrying a maximum sentence of 30 years. (Ill. Rev. Stat. 1979, ch. 38, pars 10—2(b)(1), 10—2(b)(2), 1005—8—2(a)(3).) Thus, under the authority of Supreme Court Rule 615(b)(4) (87 Ill. 2d R. 615(b)(4)), the sentences on the aggravated-kidnaping charges are reduced to 30 years.

For the above reasons the convictions and sentences for murder and armed robbery are affirmed. The convictions for aggravated kidnaping are affirmed; however, the sentences for aggravated kidnaping are reduced to 30 years.

The clerk of this court is directed to issue mandates setting Tuesday, September 24, 1985, as the date on which the sentences of death entered in the circuit court of Cook County are to be executed. The defendants shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). Certified copies of the mandates in this case shall be furnished by the clerk of this court to the Director of Corrections, to the warden of Stateville Correction Center, and to the wardens of the institutions wherein the defendants are confined.

*Judgments affirmed as modified.*

CHIEF JUSTICE CLARK, dissenting:

I cannot agree with the majority that, since no objection was raised to Dorothy Downing being accepted as a member of the jury, or any allegation of prejudice asserted in the defendants' motions for a new trial, the issue is therefore waived. Our Rule 615(a) embodies the exception to the waiver rule. It provides, in part:

"Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 87 Ill. 2d R. 615(a).

In this capital case the wife of a judge who had previously sentenced defendant Bracey in an unrelated case was permitted to sit on the jury. I believe her presence on this jury constituted plain error. "The doctrine of plain error may be invoked in criminal cases *** where the error was of such magnitude that the accused was denied a fair trial. *People v. Jackson* (1981), 84 Ill. 2d 350; *People v. Carlson* (1980), 79 Ill. 2d 564; *People v. Pickett* (1973), 54 Ill. 2d 280." *People v. Lucas* (1981), 88 Ill. 2d 245, 251.

Certainly a defendant who is being tried in a capital case, his very life hanging in the balance of the decision of the jury, has a right to be tried by a fair and impartial jury. In *People v. Cole* (1973), 54 Ill. 2d 401, 411, this court stated:

> "The right to a trial by an impartial tribunal is so basic that a violation of the right requires a reversal. (*Chapman v. California*, 386 U.S. 18; *Tumey v. Ohio*, 273 U.S. 510, 71 L. Ed. 749, 47 S. Ct. 437.) The right to a jury trial guarantees to one accused of a crime a fair trial by a panel of impartial jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. *Turner v. Louisiana*, 379 U.S. 466, 471-472, 13 L. Ed. 2d 424, 428, 85 S. Ct. 546."

When one of the jurors is the wife of a judge who has found one of the defendants guilty in a previous unrelated case and sentenced him to 12 to 36 years in the penitentiary for armed robbery, it would seem that a substantial question has been raised as to the appearance of possible partiality on the part of that juror. The degree of possible prejudice imparted to the other jurors from this knowledge alone can never be evaluated. Although I do not doubt Mrs. Downing's assertion which she made during *voir dire*, that even though her husband was a judge she could be impartial, I do believe that other jurors may have viewed her opinion in this

case as being of special value because her husband was the judge who had previously sentenced defendant Bracey or they may have believed that by voicing an opinion different from hers they might be offending her. At the very least there was the appearance of impropriety.

In *People v. Baynes* (1981), 88 Ill. 2d 225, this court stated:

> "One purpose of the plain error rule is to afford certain protections to the accused. *** The other purpose of the plain error rule is to protect and preserve the integrity and reputation of the judicial process." 88 Ill. 2d 225, 230-31.

The erroneous presence of Mrs. Downing on this jury should be corrected in order to afford both of the defendants their right to an impartial jury and a fair trial and also to protect and preserve the integrity and reputation of our judicial process.

Even though defendant Collins was never sentenced by Judge Downing, I believe that defendant Collins could have been perceived by the jury as being so closely associated with defendant Bracey that any prejudice resulting from Mrs. Downing's presence on the jury could also have affected him.

In this case, defense counsel knew during *voir dire* selection of the jury that defendant Bracey had been previously convicted of armed robbery and sentenced to a term in the penitentiary by Mrs. Downing's husband, Judge Robert Downing. Bracey's defense counsel, for whatever reason, revealed to the jury for the first time that Judge Downing had previously sentenced Bracey to a 12- to 36-year term in the penitentiary for armed robbery. Therefore, I believe that defense counsel's decision not to object to her becoming a member of the jury and Bracey's attorney's subsequent decision to make known to the jury during defendant Bracey's direct examination that Judge Downing was the judge who had previously

sentenced defendant Bracey to the penitentiary in 1970 are two errors made by counsel which are serious enough to fulfill the two-part *Strickland* standard for determining ineffective assistance of counsel. Counsel's errors, in my opinion, were so serious that they were "not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and counsel's "deficient performance prejudiced the defense." *Strickland v. Washington* (1984), 466 U.S. 668, 695, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.

In summary, I believe Mrs. Downing's presence on this jury constituted plain error which cannot be waived. I also believe that these defendants were denied their right to a fair and impartial jury and effective assistance of counsel. I would reverse the defendants' convictions and sentences and remand this cause for a new trial. Therefore, I respectfully dissent.

JUSTICE SIMON joins in this dissent.

JUSTICE SIMON, also dissenting:

I join Chief Justice Clark's dissent. In addition, for the reasons set forth in my separate opinions in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting), in *People v. Silagy* (1984), 101 Ill. 2d 147, 184 (Simon, J., concurring in part and dissenting in part), and in *People v. Albanese* (1984), 104 Ill. 2d 504, 549 (Simon, J., concurring in part and dissenting in part), I believe that the Illinois death penalty statute is unconstitutional and that the death sentence in this case should be vacated.