THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JAMES E. BOHM, Defendant-Appellant.

Third District   No. 3—90—0370

Opinion filed October 10, 1991.

Mark D. Fisher, of State Appellate Defender's Office, of Ottawa, for appellant.

Kevin W. Lyons, State's Attorney, of Peoria (Jay P. Hoffmann, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HAASE delivered the opinion of the court:

A jury convicted the defendant, James E. Bohm, of aggravated criminal sexual abuse (Ill. Rev. Stat. 1989, ch. 38, par. 12—16(c)(1)). The trial court sentenced him to a 25-year term of imprisonment. The defendant appeals his conviction and sentence.

The nine-year-old complainant testified that she was staying overnight with her Aunt Wesley and Wesley's boyfriend, the defendant, sometime in August of 1989. After going to bed on the floor of the defendant's and Wesley's bedroom, the complainant asked Wesley to put calamine lotion on her itchy knee. Wesley asked the defendant to do it. The complainant, who was dressed in a nightgown and panties, went into the living room. The defendant followed holding a bottle of calamine lotion. According to the complainant, he dropped the bottle, pushed her onto the couch, pulled off her underwear, got on top of her, and placed his "thing" inside her "private" between her legs. The complainant stated that this hurt. She began screaming and did so for approximately five minutes until her aunt came into the room. At that time, the defendant jumped off of her. The complainant went across the room to retrieve her underpants where the defendant had thrown them. She then telephoned her mother, who came and drove her home. According to the complainant, that night she told both her mother and father what the defendant had done to her. Her father told her to lie down and they would talk about it in the morning. They did not talk about it the following day because the complainant was scared. The complainant stated that about a week later she also told her grandmother what had happened.

The complainant recalled that she was examined in November or December by her family doctor, Dr. Trachtenbarg. When she told the doctor what had happened, he told her she would have to go to the hospital for a proper examination.

The parties stipulated that, if called to testify, Dr. Trachtenbarg would state that he saw the complainant on November 21, 1989, but did not conduct a sexual abuse examination because he refers those to other doctors. The referral was made that same day.

Joan McCullough, the complainant's school nurse, testified that in October or November of 1989, the complainant came into her office complaining of stomach aches. The nurse thought perhaps the complainant was starting menstruation. She subsequently sent several notes to the complainant's mother, suggesting the complainant see a doctor. When she received no response, the nurse took the complainant home and spoke with her mother in December of 1989. After Christmas, the complainant told the nurse that she had seen a doctor.

Dr. Michael Keoppen testified that he examined the complainant on January 3, 1990. The examination, done at the behest of the Department of Children and Family Services (DCFS), revealed that the complainant's vulva was red and inflamed. There was also an irregular laceration of the hymen, which was not normal for a nine-year-old child. According to Dr. Keoppen, those findings were consistent with sexual abuse and the tear was caused by penetration. The doctor opined that the tear had occurred within one to six months prior to the examination.

Tracy Tegg, the complainant's mother, testified that her sister, Wesley, and the defendant were living together during the summer of 1989 when, on several occasions, the complainant spent the night with them. About 12 a.m. on one such evening, Wesley telephoned Tegg and asked her to pick up the complainant because she was crying. Tegg asked her sister to try to calm the complainant and to call back in a half-hour if she was unsuccessful. Twenty minutes later Wesley and the defendant called to say they could not calm her.

When Tegg arrived, the complainant was crying and said she wanted to go home, but would not say what was wrong. In the car on the way home, the complainant said, "He did it to me." When Tegg asked who did what, the complainant responded, "Jimmy did." When she asked the complainant what he did, she would not say. At home, Tegg examined the complainant's "private parts" and saw nothing unusual. Both she and the complainant's father talked to her, but she would not say what had occurred. Finally, Tegg told the complainant to go to bed and they would talk in the morning. The next day Tegg asked the complainant several times what had happened, but she only said, "No, mom, I think it was a dream, nothing happened."

Tegg further testified that the school nurse called her only once in November and said that the complainant was cramping and bleeding and should see a doctor. The next day, a DCFS representa-

tive told Tegg to take the complainant to a doctor for a physical. Tegg complied. The doctor did not perform an internal examination and said everything was fine. According to Tegg, two or three weeks later, a DCFS representative told her the examination was not good enough because they suspected sexual abuse. Tegg finally took the complainant to a hospital and an examination was performed. She stated that she did not expect anything sexual and had not known what to think when the complainant said, "He did it to me." Tegg also testified that following the night of the incident, the complainant never returned to the defendant's house, not because Tegg objected, but because the defendant did. Finally, Tegg stated that she received four visits from DCFS representative Tom Ivey, but not all of them were in regard to the alleged sexual abuse of the complainant.

Beverly McClure, a DCFS child protective investigator, testified that she interviewed the complainant on January 4, 1990. Initially, the complainant denied the incident and said she had been scared by a bad dream. In the dream, the defendant was on top of her and had taken off her panties. She screamed and her Aunt Wesley came into the room.

Eventually, after being told to tell the truth, the complainant told McClure the defendant had lifted her nightshirt, taken off her panties, "grabbed her butt," and "humped" her for about five minutes. She said this hurt and that she screamed loud enough to wake Wesley and the neighbors. The complainant told McClure that she was afraid to tell anyone because her mother said she would have to go to a foster home if she did.

Peoria juvenile police officer Tommie Moton testified that she interviewed the complainant in January 1990. Officer Moton's testimony was substantially similar to that given by Beverly McClure. In addition, Officer Moton stated that the complainant demonstrated on anatomically correct dolls and told Moton that she had previously told her mother it might have been a dream.

Officer Moton also stated that she interviewed the defendant, who admitted rubbing calamine lotion on the complainant's legs, but denied having sexual intercourse with her. The defendant stated that when he applied the lotion, the complainant started screaming, but he did not know why.

Thomas Ivey, a DCFS child protective investigator, testified that he also interviewed the defendant. The defendant's responses were the same as those he gave to Officer Moton. Ivey also testified that he had received a report in November 1989 that the complainant

was at school and had cramps and a small amount of blood in her underwear. To rule out the possibility of sexual abuse, he contacted the complainant's parents and suggested an examination. Ultimately, Ivey had to make three trips to see the complainant's mother, finally threatening to take custody of the complainant, before she was examined for sexual abuse.

Wesley Tripp Bohm, who married the defendant three months prior to his trial, testified that they had been living together at the time in question. Bohm testified that on the night of the incident, she was awakened by the complainant's scream. She walked into the living room, where she found the complainant and the defendant. According to Bohm, the complainant was wearing a long T-shirt and panties. She was excited and yelling, although Bohm could not tell what she was saying. The defendant told Bohm to call the complainant's mother. Bohm asserted that she did not see anything happen.

On appeal, the defendant contends that he was not proved guilty of aggravated criminal sexual abuse beyond a reasonable doubt. He contends that the complainant's testimony was implausible, contrary to human experience, and not substantially corroborated.

■■ It is well settled that a criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. The relevant question for a reviewing court is whether, when the evidence is viewed in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) Whether the evidence is direct or circumstantial, the reasonable doubt test set forth in *Collins* should be applied in reviewing the sufficiency of the evidence in all criminal cases. (*People v. Pintos* (1989), 133 Ill. 2d 286, 549 N.E.2d 344.) In a sex offense case, the State need no longer demonstrate that the victim's testimony was clear and convincing or substantially corroborated to prove guilt beyond a reasonable doubt. *In re A.J.H.* (1991), 210 Ill. App. 3d 65, 568 N.E.2d 964.

■■ Applying the above principles to the instant case, we find that a rational trier of fact could have found the defendant guilty beyond a reasonable doubt of aggravated criminal sexual abuse. The record discloses that the complainant made a prompt complaint of the attack. While she may not have been successful in relating to her parents what happened, her mother nevertheless confirmed that

the complainant had been in a distraught state and had told her the defendant "did it to [her]." The complainant's aunt confirmed that she was awakened by the complainant's scream and that the complainant was yelling something. Additionally, the complainant told a number of people the same story when questioned about the events of that night. The medical testimony confirmed that the complainant had been sexually assaulted and that it had occurred during a time span which included the date on which she asserted the attack happened.

In support of his contention that the complainant's testimony was implausible, the defendant points out that the complainant at times told people that it was all a dream. However, we do not find it difficult to believe that at those times the child was suffering from fear of the defendant and/or shame over the incident. Certainly a jury could have reasonably believed this to be the case. Therefore, the complainant's assertions that the incident was a dream do not make her testimony as a whole implausible. In sum, we hold that a rational trier of fact could have found the defendant guilty.

The defendant next argues that his 25-year prison term was an abuse of the trial judge's discretion because it was not proportionate to the nature of the offense.

■ Sentencing is a matter of judicial discretion, and absent an abuse of that discretion by the trial court, a sentence may not be altered on review. (*People v. Cox* (1980), 82 Ill. 2d 268, 412 N.E.2d 541.) The defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment, must be equally weighed. (*People v. Darnell* (1981), 94 Ill. App. 3d 830, 419 N.E.2d 384.) When there are mitigating factors before the court, the court is presumed to have considered the mitigating circumstances, and there is no requirement that the trial judge recite and assign a value to each factor presented. *People v. Meeks* (1980), 81 Ill. 2d 524, 411 N.E.2d 9.

■ In the instant case, the trial judge specifically noted that he had considered the defendant's long criminal history, which included four Class A misdemeanors and some other traffic offenses, since the last time the defendant was incarcerated. He further noted that this was the defendant's second conviction for a sex offense in the past 10 years and that his previous sentences had not rehabilitated him. The trial judge also stated that he found no items in mitigation in the record.

The defendant was eligible for a sentence of between 6 and 30 years' imprisonment based on his previous convictions of Class 1 and Class 2 felonies (Ill. Rev. Stat. 1989, ch. 38, pars. 1005—5—3(c)(8), 1005—8—1(a)(3)). The trial court sentenced him to a term well within the permissible range for the offense. We find under these circumstances that the court did not abuse its discretion when it sentenced the defendant to 25 years' imprisonment.

The judgment of the circuit court of Peoria County is affirmed.

Affirmed.

GORMAN and McCUSKEY, JJ., concur.