2020 IL App (1st) 170983-U

No. 1-17-0983

Order filed January 17, 2020

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 20350 |
| | ) | |
| ADOLFO ZUNIGA, | ) | Honorable |
| | ) | Evelyn B. Clay, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE DELORT delivered the judgment of the court.
Presiding Justice Hoffman and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The trial evidence was sufficient to support defendant's conviction for attempt first degree murder.

¶ 2     Following a bench trial, the circuit court found defendant Adolfo Zuniga guilty of attempt first degree murder and aggravated battery. The court sentenced defendant him to 31 years' imprisonment on the attempt murder count, which included a 25-year enhancement based on his

personal discharge of a firearm. Defendant appeals, contending the State failed to prove him guilty of attempt first degree murder beyond a reasonable doubt. We affirm.

¶ 3 Defendant's arrest and prosecution arose out of the October 2, 2013, shooting of Jerany Otero-Correa, which occurred in the doorway of Lorraine's Lounge (Lorraine's), a bar located at the northeast corner of Washtenaw Avenue and 24th Street in Chicago. Chicago police officers were patrolling the area and witnessed the shooting. After a brief foot chase, defendant was arrested in the backyard of a home a few blocks away from the scene of the shooting. Video footage of the shooting was captured on Lorraine's video surveillance equipment.

¶ 4 The State charged defendant by indictment with, *inter alia*, attempt first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2012)) and aggravated battery (720 ILCS 5/12-3.05(e)(1) (West 2012)). The matter proceeded to a bench trial, at which the following evidence was presented.

¶ 5 Officer Juan Martinez[1] testified that, on October 2, 2013, he was on patrol with Officers Ruckrich,[2] David Olivares, and Mitch Vasilev, all of whom he was training in the field. J. Martinez was sitting in the right-rear passenger seat of the police vehicle as the officers traveled southbound on Washtenaw.

¶ 6 As the vehicle approached the intersection of Washtenaw and 24th Street, J. Martinez heard several loud gunshots that sounded "very close." J. Martinez looked to his left and saw a man with a thin mustache and goatee, whom he identified in open court as defendant, standing in the doorway of Lorraine's. Defendant's right arm was extended and appeared to be holding an

---

[1] The State also presented the testimony of Officer Benjamin Martinez. We will therefore refer to the officers as J. Martinez and B. Martinez.

[2] Officer Ruckrich's first name is not identified in the record.

object that looked like a gun handle or grip in his right hand. Defendant was wearing a black baseball hat with a yellow brim and a yellow "P" on it, a black sweater, and dark pants. At the time, J. Martinez was "about 40, 45 feet away, more or less" from defendant, and the area was well lit by both a "sensor light" above the door and streetlights. While defendant was in the doorway, J. Martinez saw only the left profile of defendant.

¶ 7      J. Martinez exited the vehicle as defendant fled northbound on Washtenaw and turned east into the alley north of 24th Street. J. Martinez pursued defendant and saw "more of the front profile" of defendant as defendant ran north on Washtenaw. J. Martinez observed defendant in the alley north of 24th Street going over a gate two houses east of Washtenaw and then run north through a gangway. J. Martinez ran north on Washtenaw and gave a description of defendant and his direction of flight over the radio.

¶ 8      When J. Martinez reached Washtenaw and 23rd Place, he observed defendant exit a gangway. Defendant was wearing the same clothing at the time. J. Martinez observed defendant cross the street and enter another gangway, running northbound. At that time, defendant was five or six houses east of Washtenaw. J. Martinez continued northbound on Washtenaw and observed defendant exit a gangway onto 23rd Street.

¶ 9      J. Martinez continued his pursuit to the mouth of the alley between 23rd Street and 22nd Place, at which time he lost sight of defendant and radioed for assistance in the area bounded by Washtenaw Street, Rockwell Street, 23rd Place, and 22nd Place. Shortly thereafter, he heard another unit say on the radio that a person was coming over a gate between 23rd Street and 22nd Place and the person was backtracking toward 23rd Street.

¶ 10    J. Martinez then learned defendant was apprehended at 2616 West 23rd Street. Only four minutes elapsed from when J. Martinez heard the first gunshot to when defendant was apprehended. J. Martinez went to that location and positively identified defendant as the person he had observed at Lorraine's. Defendant was breathing heavily, as if he had just been running. Next to defendant on the pavement were a black sweater and a black hat, with a yellow brim and a yellow "P" on it. J. Martinez testified that, throughout his pursuit of defendant, no one matching defendant's description was running in the area.

¶ 11    Officer Ricardo Gonzalez testified that, at approximately 11:39 p.m. on October 2, 2013, he and his partner, Officer Vierya, received an "on-view shots fired" call in the area of Washtenaw and 24th Street, which included a description of the shooter. He and Vierya relocated to the area, parked at 23rd Street and Washtenaw, and exited the vehicle. He and Vierya entered the alley north of 23rd Street on foot, traveling east. The alley was "very well" lit by artificial lighting.

¶ 12    About six to eight houses east of Washtenaw, Gonzalez heard a wooden fence rattle and observed someone trying to climb over the fence with a handgun in his left hand. Gonzalez was two or three houses away, or about 75 feet, from the rattling fence. Gonzalez saw a muzzle flash "go off over the individual that was trying to come over the fence" and then a gun fell into the alley.

¶ 13    A man, who Gonzalez identified in open court as defendant, jumped off the fence into the alley. Gonzalez ordered defendant, whose back was toward Gonzalez, to get on the ground. Defendant did not comply and instead turned to face Gonzalez and reached for the gun. At that point, Gonzalez was approximately 50 feet from defendant. Defendant was wearing a dark

sweater but did not have anything on his head. As defendant reached for the gun, Gonzalez told him, "don't pick it up." Defendant fled east down the alley, jumped onto a shed, and then onto the roof of a garage.

¶ 14    Gonzalez recovered the handgun, which was a .45-caliber Hi-Point. There was no magazine in the gun, and Gonzalez did not believe it was loaded at the time. Explaining how the gun could have discharged without being loaded, Gonzalez testified the gun could have had a round in the chamber. Gonzalez saw a shell casing next to the gate.

¶ 15    Vierya and Officers Benjamin Martinez and Banda[3] pursued defendant as he fled east. Vierya followed defendant onto the shed and out of Gonzalez's sight. Gonzalez next saw defendant while he was being processed at the station. Defendant was not wearing the dark sweater at the station.

¶ 16    Officer B. Martinez testified that, at approximately 11:39 p.m. on October 2, 2013, he and his partner, Banda, were monitoring the radio and overheard an "on-view shots fired" call at Washtenaw and 24th Street. The description of the shooter—a man wearing all black—was broadcast over the radio. He and Banda drove to the area, parked near 22nd Place and Washtenaw, and exited the vehicle to look for defendant.

¶ 17    He and Banda entered the alley north of 23rd Street after Gonzalez and Vierya, who were three to four houses in front of them. B. Martinez heard a gunshot and then saw a man jump over a fence onto the pavement in the alley. At the time, B. Martinez did not see the man's face.

¶ 18    The man ran eastbound through the alley with B. Martinez, Vierya, and Banda in pursuit. The man jumped onto "some type of garage" and Vierya did the same. Once the man jumped

_____

[3] Officer Banda's first name is not identified in the record.

onto the garage, B. Martinez lost sight of him, but Vierya told him the individual had jumped off the garage into the yard directly east of the garage. B. Martinez went to the next house east and entered the backyard.

¶ 19    In the backyard, B. Martinez saw the man he had been pursuing, whom he identified in open court as defendant, hiding in a "nook" under a staircase. Banda had located defendant first. Only 10 to 15 seconds elapsed from the time B. Martinez saw defendant jump on the roof to the time he saw defendant under the staircase. Defendant was on top of a black sweater and a black hat with a yellow brim and yellow "P" on it. B. Martinez placed defendant under arrest. J. Martinez came to the scene and positively identified defendant as the shooter.

¶ 20    Officer Ruckrich testified that, on October 2, 2013, he was driving a police vehicle while on patrol with J. Martinez, Olivares, and Vasilev. At approximately 11:39 p.m., he was driving southbound on Washtenaw toward 24th Street and, as the officers approached that intersection, he heard gunshots to his left. Ruckrich "flinched away" from the gunshots, then looked to his left, and saw a man in dark clothing standing in the door of a bar at the northeast corner of Washtenaw and 24th Street. The man had his right arm in front of him, and he was holding what appeared to be a handgun. The man was "no more than 50 feet" away from Ruckrich, and the area was lit by artificial lighting.

¶ 21    Ruckrich observed the man run northbound on Washtenaw, and he and the other officers exited the vehicle. Ruckrich momentarily lost sight of the man as the man ran behind a minivan but, as Ruckrich moved around the minivan, he saw the man again and ordered him to stop. The man did not comply and Ruckrich pursued him.

¶ 22    The man turned east into the alley north of 24th Street. At that time, Ruckrich realized he had left the vehicle running and unattended contrary to department policy, so he turned and told Vasilev to take control of the vehicle. Ruckrich then continued his pursuit but lost sight of the man.

¶ 23    Ruckrich returned to Lorraine's and found Otero-Correa lying in a small pool of blood. Otero-Correa was holding his stomach and was vomiting. Ruckrich saw two shell casings near the doorway.

¶ 24    Otero-Correa testified that on October 2, 2013, he was tending the bar at Lorraine's. His fiancée, Charlene Villa Love, their dog, and one customer were inside the bar. At approximately 11:39 p.m., Love left the bar to walk the dog, the customer walked toward the washroom, and Otero-Correa got the bar ready to close. Otero-Correa propped open the "main door" and opened the storm door "to check for other possible customers coming in before [he] locked up."

¶ 25    As Otero-Correa opened the storm door, a man whom he had never seen before was on his left side. Otero-Correa recalled the man was a "light-skinned Latino guy" who was wearing a black and yellow Pittsburgh Pirates hat, but he did not get a good look at his face. The man turned around with a black handgun in his hand and said, "What's up, D[?]" Otero-Correa replied, "I'm not no D," and backed into the bar. Otero-Correa explained, "[t]he neighborhood [was] a gang neighborhood and there's Ds in that area, and that's what they call each other."

¶ 26    The man then raised the handgun, and Otero-Correa "ran in toward the bar." The man shot Otero-Correa in the stomach, and the force of the gunshot knocked Otero-Correa into the bar counter, which was five feet behind him. Asked whether he was looking at the handgun or the man's face, Otero-Correa replied, "[a]t first I looked at the gun hoping that it was fake. And

when I got shot, I just looked up because I flew back." Otero-Correa called out to the customer in the washroom and Love to call the police. His whole left side had gone numb, and he was bleeding and vomiting.

¶ 27    Otero-Correa was taken by ambulance to the hospital, at which time the doctor told him he had been shot in the leg and stomach. Otero-Correa underwent surgery to remove a piece of his large intestine. The bullet which entered Otero-Correa's stomach remained in his body but was later surgically removed when it "came to surface level."

¶ 28    On October 3, 2013, while Otero-Correa was still in the hospital, detectives interviewed him. The detectives showed him a photographic lineup, from which he "picked out two [men] that resembled the person [who] shot [him]," one of which was defendant. Otero-Correa, however, was not able to positively identify defendant as the shooter. Otero-Correa could not remember what the shooter was wearing other than the baseball hat and could not tell if the person had any facial hair, tattoos, or piercings. When shown the black sweater that was recovered next to where defendant was arrested, Otero-Correa testified he had not seen the sweater before and did not remember if the person who shot him was wearing the sweater or one like it when he was shot.

¶ 29    The State published footage from video surveillance cameras that were affixed to both the inside and outside of Lorraine's.[4] All the relevant footage is in black and white. In the videos, the shooter is depicted wearing a long-sleeve shirt, dark pants, dark shoes, and a dark baseball cap with a light-colored bill and "P" on it. The shooter's shirt at times appears to be light gray or

_____

[4] The State's exhibit, which is included in the record, contains footage from 13 different surveillance cameras. The record indicates footage from four cameras was published to the circuit court, though it does not indicate which footage from which cameras was published. Thus, we have reviewed relevant footage from each of the 13 cameras, and we summarize it here.

white and at others dark gray. At all times, however, the shirt appears to be lighter in color than the shooter's pants, shoes, and the dark portion of his hat.

¶ 30    The footage shows the shooter walk south on Washtenaw toward Lorraine's, turn the corner east onto 24th Street, and then turn back and walk toward Lorraine's. Otero-Correa steps out of and quickly backs into the bar. As Otero-Correa is outside Lorraine's, the shooter quickly approaches him, raises his right arm while holding a black object, and then immediately flees north on Washtenaw. Approximately five seconds elapses between the time Otero-Correa opens the storm door to the time the shooter flees from the scene. The video also depicts a Chicago police vehicle arriving just as the shooter flees north on Washtenaw, and it shows four officers exiting the vehicle, with three chasing after the shooter and the other getting back into the vehicle and driving east onto 24th Street.

¶ 31    Both Ruckrich and Otero-Correa were questioned about what was depicted in the surveillance footage. In relevant part, Otero-Correa testified he had installed the surveillance cameras at Lorraine's. The cameras were not equipped with night vision and, at night, did not depict color. In addition, he installed a motion detecting spotlight above the front door, which was "the brightest [he] could find." According to Otero-Correa, the spotlight above the door "ma[de] things appear *** completely lighter" on the surveillance video. He agreed that, in some of the video footage, the shooter's shirt appeared light in color, but explained the spotlight can make black clothing look white.

¶ 32    With respect to the video footage, Ruckrich testified he was not able to positively identify defendant as the shooter. He described the shooter's clothing, based on what was depicted in the footage from one of the cameras, as "a light-colored long sleeve [shirt] with the *** two-tone

hat, and dark pants and dark shoes." However, the low-quality, black-and-white footage did not precisely depict the color of the shooter's clothing; rather, only that the shooter was wearing dark clothing.

¶ 33    After the live testimony, the parties presented seven stipulations. The parties stipulated that, if he were called as a witness, Officer Kenneth Leflore would testify that he was the evidence technician who processed four crime scenes in relation to Otero-Correa's shooting. At Lorraine's, Leflore recovered two expended .45-caliber cartridge casings that were marked "Speer 45 auto," and a fired bullet from a bullet hole inside Lorraine's. In a gangway at 2658 West 23rd Place, which was north of Lorraine's, he recovered a magazine for .45-caliber cartridges with an unknown capacity, which had five live .45-caliber rounds inside of it. In the alley behind a residence at 2626 West 23rd Street, he recovered an expended .45-caliber cartridge casing marked "Speer 45 auto." From the backyard of a residence at 2616 West 23rd Street, he recovered a black sweater and a "black and yellow or gold" hat with the letter "P" on it. In addition, Leflore collected a gunshot residue (GSR) kit from the back of each of defendant's hands after his arrest.

¶ 34    The parties stipulated that, if he were called as a witness, Bill Simon would testify that he was an investigator with the Cook County State's Attorney's office, and he took a buccal swab from defendant for DNA comparison. The parties stipulated that, if she were called as a witness, Elizabeth Sisler would testify she was a forensic scientist who would be qualified as an expert in forensic biology. She collected DNA samples from the hat and sweater recovered for comparison.

¶ 35    The parties stipulated that, if he were called as a witness, Bill Cheng would testify that he was a forensic scientist who would be qualified as an expert in forensic DNA analysis. He analyzed the gun recovered in this case for DNA, and it did not contain a DNA profile sufficient for comparison.

¶ 36    The parties stipulated that, if she were called as a witness, Lynette Wilson would testify that she was a forensic scientist and would be qualified as an expert in the field of forensic DNA analysis. She performed DNA analysis on the hat and sweater and discovered a mixture of three DNA profiles from the sweater. The major DNA profile from the sweater matched defendant's DNA profile. The minor DNA profiles in the mixture on the sweater were not suitable for comparison. With respect to the hat, she found a mixture of at least four DNA profiles, none of which were suitable for comparison.

¶ 37    The parties stipulated that, if he were called as a witness, Gregory Hickey would testify that he was a forensic scientist who is qualified as an expert witness in the field of firearm identification. Hickey analyzed the fired bullet recovered from inside Lorraine's, the two cartridge casings recovered from the doorway of Lorraine's, and the cartridge casing recovered from the alley behind 2626 West 23rd Street. Hickey concluded, within a reasonable degree of certainty, that all four items were fired by the firearm recovered by Officer Gonzalez.

¶ 38    Finally, the parties stipulated that, if he were called as a witness, Scott Rochowicz would testify that he was a forensic scientist and was qualified as an expert in GSR analysis. He would testify that GSR can be deposited in an environment where a gun is fired and environmental factors, such as rain and wind, can affect whether GSR is deposited. Additionally, if GSR is deposited, it can be removed by activity, such as rubbing against another material, or by washing

the area where the GSR was deposited. Rochowicz analyzed the GSR kit collected from the back of defendant's hands and concluded, within a reasonable degree of certainty, that defendant "may not have discharged a firearm with either hand. If [defendant] did discharge a firearm, the particles were removed by activity, were not deposited, or not detected." Rochowicz also analyzed GSR kits that were collected from the right and left cuffs of the sweater recovered from next to defendant and concluded, within a reasonable degree of certainty, the left cuff "contacted or was in the environment of a discharged firearm."

¶ 39    The State rested, and defendant moved for a directed finding. The circuit court denied the motion. Defendant elected not to present any evidence, and the court found him guilty of attempt first degree murder and aggravated battery.

¶ 40    Defendant filed a posttrial motion, which the circuit court denied. The court merged the counts and sentenced defendant to 31 years' imprisonment, which included a 25-year enhancement based on defendant's personal discharge of a firearm.

¶ 41    On appeal, defendant contends the State failed to prove him guilty beyond a reasonable doubt. Specifically, defendant asserts the video surveillance footage proves the shooter wore a light-colored shirt and fired the gun with his right hand, but the physical evidence shows defendant was wearing a black sweater and had no GSR on his right hand or sleeve. Thus, defendant argues, the "impartial, hard evidence shows [defendant] was not the shooter" and the police "arrested and convicted the wrong man." We disagree.

¶ 42    When a defendant presents a challenge to the sufficiency of the State's evidence, "a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." (Internal quotation marks omitted; emphasis in original.) *People v. Ross*, 229 Ill. 2d 255, 272 (2008). The reviewing court does not retry the defendant, and "the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence." *Id.* The mere fact that the trier of fact accepted certain testimony or made certain inferences based on the evidence does not guarantee reasonableness of the decision. *Id.* A criminal conviction will be set aside only if the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 43    Viewing the evidence in the light most favorable to the State, we conclude the State presented sufficient evidence to support defendant's conviction. To prove defendant committed the offense of attempt first degree murder as charged, the State was required to prove defendant, without lawful justification and with the intent to commit murder, shot Otero-Correa, which constituted a substantial step toward the commission of the first degree murder of Otero-Correa, causing great bodily harm. 720 ILCS 5/8-4(a), 9-1(a)(1) (West 2012); 720 ILCS 5/8-4(c)(1)(D) (West 2012).

¶ 44    In this case, the record shows, at 11:39 p.m. on October 2, 2013, Otero-Correa was shot in the stomach and leg as he briefly stepped out of Lorraine's to check for potential customers before closing for the evening. Defendant was arrested approximately four minutes later, at 11:43 p.m., in the backyard of a residence only a few blocks north of Lorraine's. When defendant was arrested, he was breathing heavily, as if he had just been running, and was lying on top of clothing that matched the description of what the shooter was wearing.

¶ 45    Four Chicago police officers were in a vehicle patrolling the area near Lorraine's at the time of the shooting and heard gunshots. Two of the officers observed a man, who was wearing dark-colored clothing and a black and yellow baseball hat and was identified in open court by J. Martinez as defendant, holding an object that appeared to be a handgun in his right hand. Defendant ran north on Washtenaw away from Lorraine's as the officers exited the vehicle in pursuit of defendant. Defendant was seen running east into the alley north of 24th Street, then jumping over a gate, and running north down a gangway.

¶ 46    J. Martinez radioed for assistance in his pursuit of defendant, broadcasting defendant's path of flight and a physical description of him over the radio. J. Martinez remained on Washtenaw but ran parallel to defendant's path of flight. Shortly after defendant entered the gangway in the alley north of 24th Street, J. Martinez observed him exit a gangway on 23rd Place, cross the street, and enter a gangway north of 23rd Place. J. Martinez continued along Washtenaw and observed defendant exit a gangway onto 23rd Street. J. Martinez continued his pursuit but, as he reached the mouth of the alley between 23rd Street and 22nd Place, he lost sight of defendant.

¶ 47    By that time, however, Gonzalez, Vierya, Banda, and B. Martinez had heard the radio calls relating to the shooting and pursuit of defendant, relocated to the area, and joined in the search for defendant. Gonzalez, Vierya, Banda, and B. Martinez picked up J. Martinez's pursuit of defendant in the alley north of 23rd Street, where J. Martinez had lost sight of defendant, walking east down the alley. In the "very well[-lit]" alley between 23rd Street and 22nd Place, Gonzalez heard a wooden fence rattle and observed a man, who he later identified in open court as defendant, attempting to climb over the fence holding a handgun, identified at trial as a .45-

caliber Hi-Point, in his left hand. Gonzalez saw the handgun discharge and fall into the alley, and defendant followed, jumping from the fence to the ground. Defendant initially had his back toward Gonzalez but, when defendant turned to reach for the handgun, he looked at Gonzalez, left the gun, and fled further east down the alley and onto a garage of a nearby residence. Gonzalez ended his pursuit to recover the handgun, but the pursuit was picked up by Vierya, who followed defendant onto the garage, Banda, and B. Martinez.

¶ 48    B. Martinez was behind Gonzalez, Vierya, and Banda as they walked through the alley between 23rd Street and 22nd Place and picked up the pursuit of defendant. B. Martinez heard a gunshot and then saw a man jump from a fence into the alley. The man fled east further down the alley and onto a garage. B. Martinez observed Vierya follow the man onto the garage. Vierya then directed Banda and B. Martinez to where he had seen the man continue his flight—the yard of the residence directly east of the garage. Less than 15 seconds later, B. Martinez observed the man he had seen running, whom he identified in open court as defendant, hiding underneath an outdoor staircase in the same yard to which Vierya had directed him. At the time, defendant was on top of a black sweater and black and yellow baseball hat.

¶ 49    Thus, the evidence established defendant was observed pointing a handgun in the doorway of Lorraine's shortly after shots were fired and fleeing the scene at 11:39 p.m. The police tracked him from the scene and, although no officer followed defendant's path exactly, the record shows each portion of his flight was observed by the pursuing officers until he was arrested a mere four minutes later in the backyard of a residence just a few blocks from where he was seen shooting Otero-Correa.

¶ 50    Further, the record shows a trail of physical evidence was recovered from locations that corroborated J. Martinez, Gonzalez, and B. Martinez's accounts of defendant's flight from the scene. As the parties stipulated, Leflore recovered two expended .45-caliber cartridge casings marked "45 Speer auto" and a fired bullet from a bullet hole at Lorraine's. One block north of Lorraine's, in a gangway at 2658 West 23rd Place, he recovered an unknown capacity magazine containing five live .45-caliber rounds. One block north from there, at 2626 West 23rd Street, he recovered an expended .45-caliber cartridge casing marked "45 Speer auto" in the alley near a wooden fence behind the residence at 2626 West 23rd Street. In the yard of the residence at 2616 West 23rd Street, where defendant was arrested, he recovered a black sweater and black baseball hat with a yellow brim and yellow letter "P" on it.

¶ 51    The physical evidence recovered by the police permitted the circuit court to find defendant was the person who shot Otero-Correa. Gonzalez recovered a .45-caliber Hi-Point handgun that discharged and dropped into the alley as defendant was coming over the fence into the alley north of 23rd Street. Though defendant was not linked to the handgun through fingerprint or DNA analysis, defendant was positively identified as the person who had dropped the handgun. The parties' stipulations established evidence was found at the scene of Otero-Correa's shooting and in the path of defendant's flight therefrom that directly linked the handgun to the shooting and defendant. The handgun was positively identified by the State's firearm identification expert, Hickey, as the handgun which had fired the two expended .45-caliber cartridge casings and the fired bullet recovered at Lorraine's, as well as the expended cartridge casing recovered near the wooden fence in the alley north of 23rd Street. In addition, a magazine

containing five live .45-caliber rounds—the same type of ammunition used in the shooting—was found in defendant's general path of flight from Lorraine's.

¶ 52    Moreover, the evidence showed defendant was holding the gun in his left hand when it discharged as he climbed over the wooden fence into the alley north of 23rd Street. According to the parties' stipulation, the State's GSR expert, Rochowicz, would have established, to a reasonable degree of certainty, the left cuff of the sweater, on which defendant was the major DNA contributor, contacted or was in the environment of a discharged firearm. Thus, the evidence established defendant was in possession of the gun that was used to shoot Otero-Correa a matter of minutes after Otero-Correa was shot.

¶ 53    Viewing this evidence in the light most favorable to the State, we conclude that the circuit court could have reasonably found beyond a reasonable doubt that defendant was the person who shot Otero-Correa in the stomach and leg at Lorraine's. Accordingly, the State presented sufficient evidence to sustain defendant's conviction.

¶ 54    Defendant nevertheless argues he was misidentified as Otero-Correa's assailant where the physical evidence and witness testimony established he was wearing a black sweater but the surveillance footage showed the assailant was wearing a light-colored sweater. According to defendant, Ruckrich corroborated the surveillance footage when he testified the video showed the shooter wearing a "light-colored long sleeve shirt." We disagree.

¶ 55    The record establishes the video footage, while truly and accurately depicting the events that occurred near Lorraine's, did not truly and accurately depict the color of the shooter's shirt. Otero-Correa, who worked at Lorraine's and installed the surveillance cameras, explained the cameras were not equipped with night vision, and the spotlight he affixed over the front door

could make dark clothing appear light on the camera footage. Further, Ruckrich did not, as defendant asserts, testify the shooter was wearing a light-colored long-sleeve shirt. Rather, he testified the video depicted the shooter in a light-colored shirt but, in reality, the shooter was wearing a dark sweater. From this evidence, the circuit court could reasonably conclude the color of the shooter's sweater was darker than what was depicted on the video.

¶ 56    Defendant also argues the inability of Otero-Correa and Ruckrich to positively identify him as the shooter also weighs in favor of his theory of misidentification. We disagree. We note J. Martinez's positive identification of defendant as the shooter was sufficient to sustain the circuit court's that defendant shot Otero-Correa. See *People v. Slim*, 127 Ill. 2d 302, 307 (1989) (single witness's identification of accused is sufficient to sustain a conviction). Moreover, as noted above, Gonzalez identified defendant as the person who dropped the gun that was used to shoot Otero-Correa.

¶ 57    Although Otero-Correa was unable to positively identify defendant as his assailant, one of the two photographs he selected from the photographic lineup was a photograph of defendant. Otero-Correa provided a reasonable explanation for his inability to positively identify defendant. He had a very brief encounter with him, had not seen him before, and was focused on the handgun pointed at him and not the shooter's face. Otero-Correa nevertheless recalled a distinctive piece of clothing the shooter was wearing—a black baseball cap with a yellow brim and yellow "P" on it—which was subsequently recovered by police from under defendant's body where defendant was arrested.

¶ 58    Ruckrich's inability to identify defendant as the shooter can be explained by the fact he was driving the police vehicle, which gave him a different vantage point than J. Martinez, who

was sitting in the right-rear passenger seat and positively identified defendant. Moreover, Ruckrich testified he "flinched away" when he heard gunshots and, shortly thereafter, defendant ran north on Washtenaw away from Lorraine's, at which point, he was chasing defendant from behind.

¶ 59    Defendant also argues the evidence relating to the GSR analysis was exculpatory, as it is undisputed Otero-Correa's assailant fired the handgun with his right hand but the results of the GSR analysis showed neither defendant's right hand nor the right cuff of the sweater he was wearing had contacted GSR. According to defendant, Rochowicz, the State's GSR expert, opined defendant "may not have discharged a firearm with either hand" and the left cuff of his sweater came back with the inconclusive result that it "contacted [GSR] related items." We disagree.

¶ 60    As an initial matter, we reject defendant's assertion the GSR analysis of the left cuff of the sweater was inconclusive. The parties' stipulation clearly established that the left cuff "contacted [GSR] related items *or was in the environment of a discharged firearm*." (Emphasis added.) In addition, we disagree the lack of GSR found on defendant's right hand and cuff was exculpatory. Here, the parties stipulated that Rochowicz would testify that GSR "can be" deposited in the environment in which a gun is fired, environmental factors such as wind and rain can affect whether GSR is deposited, and activity such as rubbing against another material can remove GSR if it is deposited. Further, it was his opinion, within a reasonable degree of scientific certainty that defendant "may not have discharged a firearm with either hand" and, if he did, "then the particles were removed by activity, were not [deposited], or were not detected by the procedure." Thus, the stipulation left open the possibility that defendant shot Otero-Correa

at Lorraine's Lounge, but GSR was removed by activity, went undetected in the analysis, or simply was not deposited when he did so.

¶ 61    Accordingly, we conclude the State presented sufficient evidence to sustain defendant's conviction. The direct and circumstantial evidence, when viewed in its totality and in the light most favorable to the State, supports the reasonable conclusion made here by the circuit court: defendant was the person who shot Otero-Correa in the stomach and leg at Lorraine's on October 2, 2013. Therefore, we affirm defendant's conviction.

¶ 62    Affirmed.