NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 180607-U

NO. 4-18-0607

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 21, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| DONALD L. REDMON, | ) | No. 17CF777 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jeffrey S. Geisler, |
| | ) | Judge Presiding. |

---

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Steigmann and Justice Turner concurred in the judgment.

**ORDER**

¶ 1   *Held*:   When all of the evidence is viewed in a light most favorable to the prosecution, a rational trier of fact could find the offense of unlawful possession of a controlled substance with the intent to deliver it (720 ILCS 5/401(c)(2) (West 2016)) and the offense of armed violence (*id.* §§ 33A-2(a), 33A-3(b-5)) to be proven beyond a reasonable doubt.

¶ 2   Defendant, Donald L. Redmon, appeals his convictions of unlawful possession of a controlled substance with the intent to deliver it (720 ILCS 5/401(c)(2) (West 2016)) and armed violence (*id.* §§ 33A-2(a), 33A-3(b-5)), contending that the evidence is insufficient to support the convictions. When we review the evidence—resolving all reasonable inferences in the State's favor, as we are required to do—we find sufficient evidence to support the convictions. Therefore, we affirm the judgment of the Macon County circuit court.

¶ 3                                    I. BACKGROUND

¶ 4        The bench trial was on March 12 and 13, 2018. The State went to trial on count III, count V as amended by interlineation, and count VI. Count III charged defendant with the offense of being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2016)) in that, having been convicted of the manufacture or delivery of cocaine in Macon County case No. 01-CF-322 and burglary in Macon County case No. 05-CF-1633, he knowingly possessed a firearm, a nine-millimeter pistol. Count V, as amended, charged that, on an unspecified date, defendant committed unlawful possession of more than 1 gram but less than 15 grams of cocaine with the intent to deliver it, having previously been convicted, in Macon County case No. 01-CF-322, of unlawful possession of a controlled substance with the intent to deliver it (*id.* § 401(c)(2); 730 ILCS 5/5-5-3(c)(2)(D) (West 2016)). Count VI charged defendant with committing armed violence (720 ILCS 5/33A-2(a), 33A-3(b-5) (West 2016)) in that, on May 31, 2017, while armed with the pistol, he unlawfully and knowingly had in his possession a controlled substance (in an amount of less than 15 grams).

¶ 5        The evidence in the bench trial tended to show the following.

¶ 6        In the early afternoon of May 31, 2017, Kasina Blockton was sitting on a porch in Decatur, Illinois, when defendant, whom she had known for about a year, walked up and talked to her. In the past, the Decatur Police Department had paid Blockton for information. Hoping to earn more money as a confidential informant, Blockton telephoned the police and reported that defendant had a gun. After making the call to the police, Blockton asked defendant if he would give her a ride to her grandmother's house, a couple of blocks away. Defendant said yes and threw the keys to Dallas Vorties, asking him to drive—or, at least, that is what Blockton told the police. The prosecutor asked Blockton:

"[T]he defendant asked Dallas Vorties to ride with him and threw the keys to Dallas Vorties?

A. I mean I don't remember that now, but yeah, I may have said that that day, if that's what you're asking did I say that that day."

¶ 7    The three of them climbed into a white car: Vorties into the driver's seat, defendant into the front passenger seat, and Blockton into the back seat. While in the car, Blockton never saw defendant or Vorties handling any drugs.

¶ 8    The three of them set out for Blockton's grandmother's house. Just as they arrived there, the police pulled them over. Vorties and defendant got out of the car and fled on foot.

¶ 9    According to the police officers' testimony, they chased defendant through several yards. As defendant ran, he was carrying a pistol, and he turned toward one of the pursuing police officers, Detective Jeff Hockaday, as if to shoot him. Hockaday fired three times at defendant, hitting him twice, thereby ending the chase.

¶ 10    A pistol was recovered close to where defendant was apprehended. Vorties likewise was armed.

¶ 11    While chasing defendant, Detective Scott Marquis saw an object fall from defendant's body and into a vacant lot. After defendant was apprehended, Marquis returned to the vacant lot, assuming it was a cell phone that had fallen. His assumption proved to be correct.

¶ 12    By authority of a warrant, the phone was searched. It contained a large number of text messages. On the basis of his 19 years' experience as a police officer with the street crimes unit of the Decatur Police Department, Chad Ramey believed that most of the text messages were "related to actual distribution of narcotics." For example, one message read: " 'Hey, I got 15. How quick can you come by?' " Another message, sent from the phone, asked a contact named Kama:

" 'How much do you need?' " Kama answered, " '20.' " Then the user of the phone responded: " 'K. B or girl?' " ("Boy," Ramey explained, was a code word for heroin. "Some people call[ed] it Hair-Ron or Ron," a "male's name." "Girl" was a code word for cocaine. The number 20 referred to $20, the typical amount charged for a "single[-]dose unit" of heroin or cocaine.) In answer to the query " 'B or girl?' " Kama answered, " 'G.' " The user of the phone instructed Kama, " 'At Willie's.' "

¶ 13        In his testimony, Ramey read quite a few other text conversations of similar import. In addition, the cell phone contained many photographs of defendant, "selfies," in which he was "holding large stacks of U.S. currency or counting U.S. currency."

¶ 14        On cross-examination, defense counsel asked Ramey:

"You weren't present when the photos were taken or you don't know if they were Photoshopped or anything like that; correct?

A. No, the photographs that I copied were actually ones that were taken from the phone.

Q. Right. But you don't know how they got there or the circumstances of their taking or anything like that?

A. No, I don't. ***

                    * * *

Q. Now, with respect to this phone, did you do anything to request the records of whose account it was or whose phone it was?

A. No, I did not.

Q. Is there anything about the text messages that you've testified to here that indicate to you who was actually using the phone at the time of the text messages?

A. Not the text messages that we reviewed, no."

¶ 15 An Illinois state trooper, December Melville, investigated the entire crime scene. The 800 block of South Webster Street in Decatur was taped off with yellow evidence tape. In his testimony, Melville identified the photographs taken at the crime scene. One photograph was of a handgun on the ground, below a porch. Another photograph was of the cell phone in the vacant lot. Another photograph was of the White Nissan automobile out of which defendant and Vorties had fled. Its front passenger door was still open. In plain sight, lying in the handle inside the front passenger door—the indentation or groove into which one placed one's fingers to pull the door shut—was a knotted clear plastic bag containing 2 heart-shaped pills and 26 smaller clear plastic bags, each of which in turn contained a powdery white substance. On the front passenger seat was defendant's wallet, with $281 in cash inside it. There was no drug paraphernalia in the car. Eight of the baggies were submitted for forensic testing, and they tested positive for the presence of cocaine. The police, however, never requested that any of the plastic baggies be examined for fingerprints or tested for DNA.

¶ 16 In the glove compartment of the White Nissan, the police found a state identification card and some insurance cards, all of which belonged to Samantha Jones. Marquis testified that Jones and defendant had been in a dating relationship and that Marquis "knew [defendant] to drive her vehicles frequently."

¶ 17 On March 13, 2018, at the conclusion of the evidence, the circuit court found defendant guilty of counts III, V, and VI.

¶ 18      On May 3, 2018, in the sentencing hearing, count V (unlawful possession of a controlled substance with the intent to deliver it) was merged into count VI (armed violence). The circuit court sentenced defendant to concurrent terms of 20 years' imprisonment for count III (habitual criminal) and 25 years' imprisonment for count VI.

¶ 19      On June 1, 2018, defendant moved for a reduction of the sentences.

¶ 20      On August 27, 2018, the circuit court denied the motion.

¶ 21      On September 6, 2018, defendant filed his notice of appeal.

¶ 22                                II. ANALYSIS

¶ 23      Defendant contends that we should reverse the convictions of count V (unlawful possession of a controlled substance) and count VI (armed violence) because, according to him, the State failed to prove he knowingly possessed the cocaine that the police found in the handle of the passenger door.

¶ 24      To prove defendant guilty of possessing a controlled substance with the intent to deliver it (720 ILCS 5/401(c)(2) (West 1016)), the State had to prove that (1) he knew of the presence of the controlled substance, (2) the controlled substance was in his immediate possession or control, and (3) he intended to deliver the controlled substance. See *People v. Robinson*, 167 Ill. 2d 397, 407 (1995).

¶ 25      Under case law, defendant explains, knowledge of the presence of narcotics may be inferred from the possession of them, and such possession can be either actual or constructive. See *People v. Smith*, 2015 IL App (1st) 132176, ¶ 26. To prove that defendant actually possessed the narcotics, the State would have to prove that he "exercised some form of dominion over" them, such as by trying to hide the narcotics or to throw them away. (Internal quotations marks omitted.) *People v. Love*, 404 Ill. App. 3d 784, 788 (2010); but see *People v. Givens*, 237 Ill. 2d 311, 335

(2010) (noting that actual possession "does not require present personal touching of the illicit material"). Constructive possession, by contrast, "may be proved by showing that the defendant had knowledge of the presence of the contraband and had immediate and exclusive control over the area where the contraband was found." *Love*, 404 Ill. App. 3d at 788. The defendant's knowledge of the contraband cannot be reasonably inferred merely from defendant's presence of the car in which the contraband was found. *Id.* More circumstantial evidence of knowledge would be required, such as suspicious behavior by the defendant (*People v. Macias*, 299 Ill. App. 3d 480, 487 (1998)) or "the visibility of the contraband from the defendant's location within the car" (*Love*, 404 Ill. App. 3d at 788).

¶ 26 Defendant argues that, in the jury trial, the State presented no evidence of his actual or constructive possession of the narcotics in the indentation of the passenger door handle. He denies that the narcotics were in plain sight. According to him, "[t]he picture of the vehicle shows that the cocaine was balled up in the passenger door compartment," and "[t]he existence of the 26 individual baggies could only be ascertained once they were removed from the compartment."

¶ 27 Defendant denies that his flight from the traffic stop had any tendency to prove his knowledge of the cocaine balled up in the indentation of the passenger door handle. He had a compelling, entirely distinct reason to flee because he was a convicted felon in the possession of a firearm. Fleeing with the incriminating pistol but knowingly leaving incriminating cocaine behind would make no sense. It is "implausible," defendant argues, "that he would abandon the cocaine in the passenger side of the door [and] yet leave with the firearm."

¶ 28 Granted, at the time they were pulled over, defendant was sitting in the passenger seat (with the cocaine at his right elbow), and Vorties was driving—but that fact, in defendant's view, only weakens the State's case because it shows that Vorties, instead of defendant, had

dominion over the car in which the cocaine was found. Vorties, not defendant, was the driver of the car, and Samantha Jones, not defendant, was the owner of the car. The State failed to tie defendant to the car, he argues, and, thus, the State failed to tie him to the cocaine in the car.

¶ 29    For all its text messages about drug dealing, the cell phone in the vacant lot, defendant contends, failed to tie him to the cocaine in the car or to show his awareness of that cocaine. The text messages about drug transactions were several days old. And, besides, defendant continues, the State never presented any evidence on the question of who owned the phone. Thus, in defendant's view, it was unproven that he, defendant, was the person who had sent the text messages.

¶ 30    For all those reasons, defendant maintains, the State failed to prove, beyond a reasonable doubt, that he had knowledge of the cocaine and, hence, failed to prove that he knowingly possessed the cocaine with the intent to deliver it.

¶ 31    The State insists, on the other hand, that the circumstantial evidence justified a reasonable inference of knowledge. For one thing, the State disagrees that the narcotics were somehow obscured from plain view. They were sitting in the passenger door handle, where they "were easily accessible to defendant" and "could not have been missed by anyone closing the door." True, defendant left the cocaine behind when he ran, but he might not have had time to grab the cocaine, whereas the pistol was already on his person. Or he might have left the cocaine behind by design, in the hope that he would not be associated with it but that the suspicion would fall, instead, on Vorties, the driver, or Jones, the owner of the car. The States cites *People v. O'Neal*, 35 Ill. App. 3d 89, 91 (1975), for the proposition that "[p]roof of ownership is not required." Defendant need not be the owner or controller of the premises in which the contraband was found (see *People v. Givens*, 237 Ill. 2d 311, 335 (2010))—although such ownership or control can be

damaging to the defense (see *Love*, 404 Ill. App. 3d at 788)—and defendant need not be the only person in the premises: possession of contraband can be joint (*Givens*, 237 Ill. 2d at 335). In other words, the State's point is this: that Vorties—who likewise fled at the approach of the police and who likewise was armed with a pistol—was quite possibly a drug dealer (and the cocaine in the door handle was the merchandise) did not lessen the probability that defendant was a drug dealer. They could have been in business together. At a minimum, the State insists, defendant was in the business, considering what was found in the cell phone he dropped in the vacant lot.

¶ 32       And yet, defendant rejoins, "the State fails to acknowledge that it failed to investigate who actually owned the phone." Thus, according to defendant, "the cell phone recovered in a vacant lot at the scene did not prove that [defendant] knew of the presence of cocaine" in the car. "[T]he 26 baggies," defendant argues, "were tightly bound inside of a plastic baggie[,] and their mere presence in the door handle did not suggest that they were controlled substances."

¶ 33       People's group exhibit No. 10 includes photographs of the narcotics nestled in the indentation of the passenger door handle, the handle a passenger would use to pull the door closed. The passenger door is open. Two of the photographs appear to have been taken from the vantage of someone standing over the door handle. The photographs show a knotted transparent bag plainly visible in the indentation or groove of the door handle. It is readily apparent to a viewer of these photographs that the transparent plastic bag contains multiple chunks of a white substance. The viewer would not be able to ascertain, just by looking at the bag, that the number of chunks inside the bag was precisely 26. But only someone who has led an extraordinarily sheltered existence would fail to suspect that these were dosages of cocaine packaged for delivery.

¶ 34 Defendant, it could be readily inferred, was not one of these naïfs. In the cell phone that he dropped in the vacant lot as he was running from the police were text messages negotiating drug sales and photographs of defendant proudly displaying his cash. Defendant argues that ownership of the phone was unproven. We disagree. Defendant possessed the phone, and, "[o]wnership of personal property *** is presumed from the possession of it." *People v. Four Thousand & Eight Hundred Fifty Dollars ($4,850) U.S. Currency*, 2011 IL App (4th) 100528, ¶ 17; see also *Brenner v. Evelyn Statsinger Trust*, 2018 IL App (1st) 180131, ¶ 9.

¶ 35 In sum, when we consider that defendant had control of the car, judging by his tossing the car keys to Vorties and asking him to drive; when we consider that the cocaine was in plain sight in the car, at defendant's right elbow; and when we consider the evidence in defendant's cell phone that he was indeed a trafficker in cocaine, these convictions easily pass the test in *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Looking at all the evidence in the light most favorable to the prosecution, we are unable to say it would be impossible for any rational trier of fact to find the elements of unlawful possession with intent to deliver and armed violence to be proven beyond a reasonable doubt. See *id.*

¶ 36 III. CONCLUSION

¶ 37 For the foregoing reasons, we affirm the circuit court's judgment.

¶ 38 Affirmed.