2020 IL App (1st) 170950-U

Third Division
October 28, 2020

No. 1-17-0950

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 10976 |
| | ) | |
| JESSIE WHITE, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for aggravated kidnapping is affirmed over challenge to sufficiency of evidence. Use of knife was part of overall act of abducting victim, and rational trier of fact could have found knife to be "dangerous weapon."

¶ 2    Following a bench trial, defendant Jessie White was found guilty of two counts of attempt first degree murder, aggravated kidnapping, and aggravated battery and sentenced to 14 years' imprisonment.

¶ 3    On appeal, defendant argues that his conviction for aggravated kidnapping should be reduced to kidnapping. We affirm.

¶ 4                                    BACKGROUND

¶ 5      Defendant was charged by indictment with two counts of attempt first degree murder, one

count of aggravated kidnapping, four counts of aggravated battery, and one count of burglary. In

the aggravated kidnapping charge, the State alleged that defendant kidnapped Anna Morales

while armed with a knife. The matter proceeded to a bench trial, at which the following evidence

was presented.

¶ 6      Morales testified that on June 10, 2014, she walked past St. Pancratius Church on her

way to pick up her eight-year-old daughter, S.C., from school. She saw somebody sitting on the

steps of the church. After Morales picked up S.C. from school, they walked to a nearby grocery

store to buy sodas and snacks before walking home. As they walked home, Morales and S.C.

passed St. Pancratius Church. Morales saw the same person, whom Morales identified in court as

defendant, still sitting on the steps of the church.

¶ 7      When Morales and S.C. passed an alley next to St. Pancratius, Morales "felt somebody

come up behind [her]," put one hand over her glasses, and press "something sharp" against her

neck. Morales told S.C. to run and get Morales's husband, Jose Canchola. As S.C. ran away,

Morales was being pulled back into the alley and into a gangway. The sharp object was still

pressed against her neck. Morales turned around and saw defendant holding "a small kitchen

knife."

¶ 8      Defendant then raised the knife and started stabbing Morales on the right side of her head

as he continued to pull her into the alley and then into the basement of a house. Morales tried to

cover herself, and she heard something fall and make a "clanging" noise. Defendant began to

drag Morales into a corridor on the side of the building. He then pushed Morales down and dragged Morales by her feet into a basement.

¶ 9    Defendant then got on top of Morales, grabbed her by the head, and "smash[ed] [her] head against the ground" more than 10 times. At that point, Morales no longer saw the knife and defendant was not holding anything. Morales asked defendant "why was he doing this," and defendant told her to "shut up." Morales told defendant she had a daughter and pleaded with him to let her go. Defendant told Morales that "he was going to kill [her]" and that he "had to kill [her]." Morales tried yelling for help, but defendant began strangling her by pressing his hands around her throat "really, really hard."

¶ 10    Morales lost consciousness. When she awoke, she saw "shadows of people," whom she believed to be her husband Jose, Jose's uncle, David Canchola (Uncle David), and defendant. Morales eventually stood up and saw that Jose was holding defendant down. Defendant told Morales he was sorry and "that he just wanted to kill [her]." Morales walked outside and saw S.C. standing with her husband's brother, who was named David Canchola (Brother David) in the alley. Morales saw the blade of the knife on the ground. Morales went back into the basement and saw the handle of the knife on the ground.

¶ 11    During her testimony, Morales clarified that she believed the knife blade separated from the handle before defendant began stabbing her in the head. She did not believe she was ever stabbed with the blade of the knife, but rather was struck with the knife handle. The knife blade separated from the handle while she and defendant were in the alley but before he dragged her into the basement. Morales was shown the actual knife blade and handle, as well as photographs

of the knife blade and the handle, all of which she identified as the knife defendant used during the attack. The photographs and knife parts were admitted into evidence.

¶ 12    S.C. testified that on June 10, 2014, Morales picked her up from school. After she and Morales stopped for drinks and snacks, they walked home holding hands. She and Morales walked by a church, and she saw defendant on his phone.

¶ 13    Morales let go of S.C.'s hand, and S.C. saw defendant cover Morales's face with his hand and place a knife with a black handle and silver blade to her neck. S.C. kicked defendant, and defendant tried to swing the knife at S.C.'s neck. S.C. testified the knife was in two pieces at that point, and defendant swung the "silver part" at her. Morales told S.C. to get Jose, and S.C. threw her backpack at defendant and ran home.

¶ 14    There, S.C. rang the doorbell, and her grandmother answered the door. S.C. told her grandmother someone had taken Morales. Jose, Uncle David, and Brother David went to the alley with S.C. Once there, S.C. stayed in the alley with Brother David while Jose and Uncle David went into the basement of a nearby building.

¶ 15    Jose testified that on June 10, 2014, he was at home with Brother David, Uncle David, and his mother when S.C. rang the doorbell "[10] times or more." Jose's mother answered the door and called him downstairs. He saw S.C. crying, and S.C. said "somebody had stolen [Morales]."

¶ 16    Jose, Brother David, and Uncle David followed S.C. to the alley next to St. Pancratius Church, where they saw an umbrella that Morales had been given by Jose's mother laying in the alley. Jose saw an open gate leading into a gangway and went inside the gate. He then saw a damaged door, which he entered. Jose saw S.C.'s backpack and heard Morales screaming. Jose

went into the basement and saw Morales lying unconscious on the floor. Defendant was on top of Morales choking her.

¶ 17    Defendant got up, and he and Jose began fighting. Morales eventually got up from the floor, which distracted Jose. With Jose distracted, defendant tried to run away, but was stopped by Uncle David. Defendant began fighting with Uncle David, and Jose stepped in. Eventually, Jose restrained defendant in a chair, and defendant told Morales, "I just wanted to kill you."

¶ 18    Uncle David testified that when he asked defendant why he had attacked Morales, defendant said "he only wanted to kill her."

¶ 19    Brother David testified that after following Jose into the basement, he saw Morales lying unconscious on the floor. However, he became worried that S.C. would come in and see her mother, or that there was a second attacker still outside, so he returned to the alley to keep S.C. safe. Brother David helped Morales out of the basement after she regained consciousness.

¶ 20    Assistant State's Attorney Joseph Carlson testified that shortly after midnight on June 11, 2014, he met with defendant at the police station and Mirandized him. Defendant then gave a statement, which Carlson memorialized in writing and which defendant reviewed and signed.

¶ 21    In the statement (which was admitted into evidence and published to the trial court), defendant stated on that around noon on June 10, 2014, he was sitting on the steps of St. Pancratius watching videos on his phone while he waited for it to stop raining. Defendant sent a text message to his girlfriend who had kicked him out her house the week before because she thought he was a criminal. Defendant's girlfriend responded by telling defendant to stop contacting her and, threatening to call the police if he came to her house. Defendant then "got really mad" and did not understand " 'why the hell this was happening to him.' "

¶ 22    Around 3 p.m., defendant was still sitting on the steps of St. Pancratius when he saw a little girl, which made him so mad he wanted to hit something. Defendant explained that the girl seemed "so happy" and defendant thought, "if he couldn't be happy, why should anyone else be happy." According to defendant, the "little girl" had a "little baby" with her and, as they walked by the church, he walked up to the "taller girl" and restrained her arm with his right hand as he raised a kitchen knife to her neck. The "taller girl" yelled to the "little girl" to run and get her father, and then repeatedly asked defendant to "please let [her] go."

¶ 23    Defendant stated that after the "little girl" ran away, the "taller girl" hit him on the arm, where he was holding the knife. The knife hit his side and then broke. Defendant threw the "taller girl" to the ground in the alley and started punching her in the face and head. Defendant picked the "taller girl" up by the arms, moved her into the basement, which he had discovered was accessible earlier in the day, and placed her on her back. Defendant got on top of her to restrain her and then started choking her with both hands. Eventually, defendant rolled her to her side and began hitting her on the head.

¶ 24    Defendant then got up and looked around the room. A "young kid, an older guy with long hair, an elderly man, and another one came into the basement" and the man with the long hair started to fight him.

¶ 25    The State rested, and defendant moved for a directed finding. The trial court granted the motion with respect to two of the aggravated battery charges, both of which alleged defendant committed aggravated battery against S.C. by pushing her to the ground, but denied the motion as to the other charges.

¶ 26    Defendant did not present any evidence. During closing argument, defense counsel contended that the State did not prove the offense of aggravated kidnapping because the knife broke while defendant and Morales were in the alley, and he was no longer armed with a knife when he dragged Morales into the basement.

¶ 27    The court found defendant guilty of both counts of attempt first degree murder, aggravated kidnapping, and one count of aggravated battery, which was based on defendant's placement of the knife to Morales' neck. The court found defendant not guilty of the other aggravated battery count as well as the burglary count. With respect to the aggravated kidnapping charge, the court explained the knife was part of the attack and defendant was "already in motion" with Morales, dragging her from the public street to move her into a secret place later, when the knife blade separated from the handle.

¶ 28    The matter proceeded to sentencing. The trial court merged one of the attempt first degree murder convictions and the aggravated battery conviction into the other attempt first degree murder conviction, and sentenced defendant to concurrent 14-year prison terms on the remaining attempt first degree murder and aggravated kidnapping convictions. Defendant filed a motion to reconsider sentence, which the trial court denied. This appeal followed.

¶ 29                                          ANALYSIS

¶ 30    On appeal, defendant contends the State failed to prove him guilty beyond a reasonable doubt of aggravated kidnapping. His argument proceeds in two parts. First, defendant contends that the State failed to prove he was armed with a knife when he kidnapped Morales because the knife broke before he absconded with her into the basement. Second, defendant argues that the State failed to prove the knife was a dangerous weapon as that term is defined in the armed

violence statute, as applied to the aggravated kidnapping statute, because the State failed to present any testimony regarding the length of the blade.

¶ 31    When a defendant presents a challenge to the sufficiency of the State's evidence, "a reviewing court must determine whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted; emphasis in original.) *People v. Ross*, 229 Ill. 2d 255, 272 (2008). The reviewing court does not retry the defendant, and "the trier of fact remains responsible for making determinations regarding the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence." *Id.* The mere fact that the trier of fact accepted certain testimony or made certain inferences based on the evidence does not guarantee reasonableness of the decision. *Id.* A criminal conviction will be set aside where the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

¶ 32    "A person commits the offense of kidnapping when he or she knowingly *** by force or threat of imminent force carries another from one place to another with intent secretly to confine that other person against his or her will." 720 ILCS 5/10-1(a)(2) (West 2014). Pursuant to section 10-2(a)(5) of the Criminal Code of 2012 (Code), the offense becomes aggravated kidnapping when the defendant commits the kidnapping "while armed with a dangerous weapon, other than a firearm." 720 ILCS 5/10-2(a)(5) (West 2014). Section 10-2(a)(5) of the Code borrows its definition of "dangerous weapon" from the armed violence statute, which states, in pertinent part, a person is armed with a dangerous weapon when he or she is armed with a "knife with a blade of at least [three] inches, dagger, dirk, switchblade knife, stiletto, axe, hatchet, *or other*

*deadly or dangerous weapon or instrument of like character*." (Emphasis added.) 720 ILCS 5/10-2(a)(5), 33A-1(c)(1), (c)(2) (West 2014). Thus, to sustain defendant's conviction, the State was required to prove defendant knowingly by force or threat of imminent force carried Morales from one place to another with intent to secretly confine Morales against her will, while armed with a knife with a blade of at least three inches "or other deadly or dangerous weapon or instrument of like character." 720 ILCS 5/10-1(a)(2), 10-2(a)(5), 33A-1(c)(2) (West 2014).

¶ 33    With respect to his first argument, defendant maintains that the kidnapping did not begin when defendant placed the knife against Morales' throat and pulled her into the alley because, at that time, Morales had not yet been secretly confined. Rather, defendant argues the kidnapping began when defendant dragged Morales to the side of the building and into the basement, at which point he was no longer armed with a deadly weapon because, by that point, the knife blade had already separated from the handle. We disagree.

¶ 34    As the trial court correctly noted in rejecting this argument below, the knife used by defendant was part of the attack, and defendant was already in motion with Morales at the time the knife blade separated from the handle. Defendant provides no citation to any authority to support his compartmentalization of the offense. The offense began when defendant dragged Morales from the sidewalk and into the alley, at which time he was still armed with the knife. Even if the alley was still visible to the public, defendant had already begun carrying Morales, by force, at knifepoint, from the street to the basement, where he then secretly confined her.

¶ 35    Defendant's citation to *People v. Neylon*, 327 Ill. App. 3d 300 (2002) does not mandate a different result. In *Neylon*, the defendant was charged with armed violence based on his personal discharge of a firearm while committing the felony of possession of a controlled substance. *Id.* at

302. At trial, the State failed to prove not only that the defendant personally discharged a firearm, but also that he did so while committing the felony of possession of a controlled substance. *Id.* at 307.

¶ 36    By contrast, in the present case, the evidence adduced by the State at trial established that defendant was armed with a knife when he attacked Morales from behind and began carrying her toward the basement. The fact that Morales was able to disarm defendant while he was carrying her to the secret location to complete his attack does not change our conclusion that he was armed while committing the offense, as his transportation of Morales from the street, through the alley, to the basement was all part of a single occurrence. *Cf. People v. Smith*, 2019 IL App (1st) 161246, ¶ 33 ("[W]e categorically reject defendant's claim that he could not have been guilty of aggravated criminal sexual assault unless he displayed the knife at the precise moment of sexual penetration.").

¶ 37    Defendant's citation to *People v. Lamkey*, 240 Ill. App. 3d 435 (1992) is similarly unavailing. In *Lamkey*, we reversed the defendant's aggravated kidnapping conviction because the State failed to prove that the defendant secretly confined the victim. *Id.* at 439. We noted the evidence at trial established the crime occurred in the vestibule of the building which could be seen from the public street, and that one of the State's witnesses had in fact seen the defendant committing the crime while he was on the public street and even made eye contact with the defendant through a glass door. *Id.*

¶ 38    Here, by contrast, defendant eventually secretly confined Morales in a basement that was not visible from the public street. It makes no difference that when defendant initially brandished the knife, he was in a publicly viewable space. The crime here was not a series of unconnected

events. This crime was a process of events that were linked together, beginning with defendant wielding the knife and subsequently using it to strike Morales. *Smith*, 2019 IL App (1st) 161246, ¶ 33. It is likewise immaterial that defendant became disarmed before absconding with Morales. By that time, an aggravated kidnapping was well in progress: Defendant had already brandished the knife and used it to assault Morales immediately before whisking her away to the basement. *Id*. ¶¶33-38.

¶ 39    Next, defendant argues the State failed to prove he was armed with a dangerous weapon as that term is defined in the armed violence statute, which definition applies to the aggravated kidnapping statute, because the State failed to elicit any description of the length of the blade from its witnesses. Defendant focuses on the language in section 33A-1 of the Code, which states a "knife with a blade of at least three inches" is a dangerous weapon, and claims that the State was thus required to prove the blade of the knife he placed to Morales' neck was at least three inches. See 720 ILCS 5/33A-1(c)(2) (West 2014).

¶ 40    We disagree. Defendant's argument ignores the remainder of section 33A-1(c)(2), which states a weapon is a dangerous weapon if it is "of like character" to the weapons specifically enumerated in section 33A-1(c)(2). 720 ILCS 5/33A-1(c)(2) (West 2014). Indeed, a knife need not have a blade of at least three inches in length to be considered a dangerous weapon under the armed violence statute when it could have been dangerous if used in a dangerous manner. See, *e.g.*, *People v. Mares*, 2018 IL App (2d) 150565, ¶ 11 ("As the statute's residual clause indicates, a knife with a blade that is not at least three inches long can still be a deadly weapon."); *People v. Samier*, 129 Ill. App. 3d 966, 968-69 (1985) (knife with blade of less than 3 inches was "dangerous weapon," as it was used to threaten life of victim and could have taken her life as

threatened); *People v. Westefer,* 169 Ill. App. 3d 59, 62 (1988) (one-inch utility blade was "dangerous weapon"); *In re T.G.*, 285 Ill. App. 3d 838, 846 (1996) (quoting 720 ILCS 5/33A-1(b) (West 1992) ("Under the armed violence statute, a knife can be a deadly weapon either if its blade is at least three inches long or if it is an 'instrument of like character' as to the other weapons listed in section 33A-1 of the [Code].").

¶ 41     In this case, the State presented the testimony of Morales, who stated that defendant placed a sharp object against her neck. When she turned around, she saw defendant holding a "small kitchen knife." Morales identified the actual knife blade and photographs of the knife blade, which were then published to and viewed by the trial court. Having viewed the actual knife blade, the trial court, as the finder of fact, could reasonably conclude the knife blade was at least three inches in length. Further, even if the knife blade was not at least three inches in length, the court could also reasonably conclude the knife was an instrument "of like character" to a knife with a blade at least three inches in length, and could be dangerous if used, as it was in this case, in a dangerous manner.

¶ 42                                    CONCLUSION

¶ 43     We affirm defendant's conviction for aggravated kidnapping.

¶ 44     Affirmed.